Argued January 20; affirmed April 5, 1932

# SULLIVAN *v.* MOUNTAIN STATES POWER CO.

(9 P. (2d) 1038)

*John D. Goss,* of Marshfield (Goss, Murphy & Skipworth, of Marshfield, on the brief), for appellant.

*Chris Boesen,* of Marshfield (Claud H. Giles, of Marshfield, on the brief), for respondent.

ROSSMAN, J. A consideration of the aforementioned assignments of error will be greatly facilitated by a review of the evidence favorable to the plaintiff. Since a motion for a nonsuit and for a directed verdict is controlled by the evidence favorable to the plaintiff (*Saylor v. Enterprise Electric Co.,* 110 Or. 231 (222 P. 304, 223 P. 725); *Brady v. Oregon Lumber Co.,* 117 Or. 188 (243 P. 96, 45 A. L. R. 812); *Cooper v. North Coast Power Co.,* 117 Or. 652 (244 P. 665, 245 P. 317);

*Burton v. Abbett Tinning & Roofing Co.,* 120 Or. 536 (252 P. 973)); we shall confine our review largely to that part of the testimony.

June 16, 1930, the plaintiff was engaged in logging operations upon a tract of land in Coos county, south of and adjoining the highway which connects the cities of Empire and North Bend. Immediately adjacent to the north side of this highway the defendant maintained an electrical transmission line which consisted of five copper wires strung on poles 300 feet apart, equipped with two cross-arms. Two of the wires consisted of No. 2 wire capable of carrying 11,000 volts each. Three were No. 4 wire capable of carrying 2,300 volts each, but two of the latter were not in service at the time with which we are concerned. None of the wires was insulated. At the point in question the wires were 33 feet above the ground. The area on both sides of the aforementioned road in the vicinity of the accident had been covered with a stand of timber, but two years previously the logging operations on the north side of the road had taken out all of the large merchantable timber. The timber on the south side had been felled, and the plaintiff was now engaged in moving it out. The defendant possessed the right to remove any trees which interfered with or endangered its wires.

June 16, 1930, there stood north of the transmission lines a green, growing hemlock tree. The answer thus describes it:

"Until a short time before said fire occurred, the hemlock tree mentioned in the complaint was protected against high winds by reason of the fact that it was surrounded and was a part of a heavy growth of standing timber; that before said fire said timber was logged off by the plaintiff but was not logged clean and said

hemlock tree with other small trees, saplings and snags were left exposed to high winds and unprotected by other timber; that plaintiff in his said logging operation had felled other trees against said hemlock tree and had brought his logging equipment and lines in contact with said tree by reason of which said tree had been greatly weakened and likely to fall; * * * the weakened condition of said hemlock tree was not apparent or discoverable by said inspection and was unknown to defendant and could not have been known to defendant in the exercise of that degree of care required by law.''

The uncontradicted evidence showed that the plaintiff had not logged near this tree and his operations had not touched it. The logging operations north of the highway had been concluded two years before the fire in question occurred, and before the defendant's high tension wires were strung. The witnesses variously described the diameter of the hemlock tree at its butt as from six to ten inches. The evidence leaves the impression that the height of the tree exceeded 60 feet. The parties did not agree how close the hemlock stood to the wires. W. P. Slyter, a witness for the plaintiff, testified that he estimated this distance to be "somewhere about 30 feet, maybe 35 feet." John Walsh, the district fire warden, testified that this hemlock was one of a group that was growing "all the way from 20 feet to 30 feet" from the road. At the request of the defendant, D. L. Buckingham, a civil engineer, prepared a plat showing the various objects concerning which it was assumed that the witnesses would testify. These objects had been called to his attention by the defendant before he prepared the map. As a witness for the plaintiff, he identified the hemlock and its distance from the wires. At one time, in describing this distance, he testified "it is marked

30 feet,'' and at another time he stated: ''That stump is 43 feet from the place the wire was.'' It is possible that the latter statement may have had reference to another hemlock stump indicated on the plat.

June 16, 1930, a severe northwest wind was blowing, which is thus described in the defendant's brief: ''A very high northwest wind was blowing, and many trees were being blown down.'' There is no contention that the wind was an unusual one for the same brief concedes that such ''high northwest winds prevail along the coast in summer.'' About 3 p. m. the aforementioned hemlock tree fell against the transmission lines, causing two of them to break or come in contact with one another for a sufficient time to create enough heat that they weakened and then broke. What took place is thus described by some of the witnesses: Alton Sydan, a witness for the plaintiff, who was about 300 yards from this place, ''heard an awful rumble * * * pretty quick there was another one.'' When he investigated he saw the hemlock tree leaning against the wires and ''it was smoking.'' Later he added that he saw it ''smoulder.'' He also discovered that two of the wires were broken. According to him, ''the awful rumble'' was accompanied with a ball of fire about as big as a foot in diameter which displayed itself ''for a little bit and then it went right out.'' Joe Dan, who was working about 150 or 200 feet from the highway, heard ''a kind of roaring noise'' and, believing ''there was something wrong on the highway,'' investigated. He found the tree resting against the wires and two of the latter dangling on the ground. He did not see any smoke or flame come from the hemlock tree. W. P. Slyter, who was working upon adjacent premises about 100 feet or more from the highway, testified: ''I saw a small tree swaying over into the power lines and it

made a great flash of fire and then there was quite a report shortly afterwards, and then it did that once more. There was sparks and stuff flying from them as though the tree touched against the power line." "Q. You could see the tree touching the power line? A. Yes, sir." He added that when he heard the reports he saw a flash of flame which looked like a ball of fire of the size of a bushel basket. Gray Slyter, a son of the witness just mentioned, testified that he too was only 100 or 150 feet from the spot where this incident occurred. He heard two "large reports" and, his interest being aroused, "looked up and I saw the flash" which he described "as big as a barrel and sparks of fire coming from it." Other witnesses called by the plaintiff gave similar testimony, although they did not see any sparks emanate from the hemlock tree. All of them, however, saw a flash or a ball of fire accompanied with a very loud noise. Some of them described the ball of fire as being in the hemlock tree, while others thought it was on the ground. Witnesses called by the defendant likewise described the broken hemlock leaning against the three remaining wires at an angle estimated as being 30° from horizontal. One of the defendant's witnesses, who was working 400 yards from this spot, heard "three loud reports." Another witness for the defendant, as he approached this spot, "saw some light over the wires off the road out on this line" and, concluding that trouble had occurred with the power lines, notified the defendant to that effect. The answer thus describes the foregoing incident: "Admits that a small hemlock tree came in contact with the power line of the defendant; admits that by reason of the contact between said tree and the power wires of said defendant said tree became ignited."

Virtually all of the above mentioned witnesses, as well as others who testified, went at once to the spot from which they believed the sound had emanated and, as will be observed from the foregoing, found the broken hemlock supported by the wires. All of the witnesses agreed that upon arriving at that place they observed a small fire smouldering in an old cedar snag which was about four feet in diameter at the base. According to the defendant's measurements, it was 32 feet tall. It stood about 15 or 20 feet from the edge of the roadway and was 88 feet from the point where the power line broke. This snag was almost due north of the hemlock. Complete accuracy demands that we should modify north by saying that it was slightly northeast. Although none of the witnesses testified that he had seen any smoke or fire in this vicinity before he heard the above described reports, all saw the smouldering fire in some dry material in a hole or knotty place near the top of this snag when they arrived there or a few moments after hearing the reports. One of the defendant's witnesses associated in his mind the reports and the fire in the snag, thus:

"Q. Well, now, how long after you heard the reports before you took any notice about any fire?

"A. It could not have been five minutes.

"Q. Then what did you see?

"A. I saw smoke.

"Q. Then did you go down there?

"A. Yes, sir."

Upon reaching the scene of the accident he saw the smouldering fire in the snag. According to the witnesses, the fire was about as large as two hands, but rapidly grew in size. One of the witnesses described its spread thus: "It blazed up shortly after I first noticed it. The wind fanned it up pretty quick."

The men that gathered at the fire undertook to extinguish it. Water was obtained from a place near at hand, but the loggers were unable to throw it upon the blaze because the latter was 15 or more feet from the ground. About this time linemen in the defendant's employ arrived for the purpose of repairing the broken lines, and in a few moments Mr. J. W. Asplund, superintendent of the defendant, arrived. The defendant's men at once applied themselves to the task of disengaging the hemlock from the wires and repairing the broken lines. They admitted that they made no effort to extinguish the fire and contended that it had already reached such proportions that their efforts would have been unavailing. Several of the plaintiff's witnesses testified that when the defendant's crew arrived the blaze was still confined to the cedar snag and had not yet gone to the ground. When the defendant's crew had repaired the wires they withdrew and returned to North Bend. Alton Sydan testified that when the defendant's crew arrived the fire was still confined to the snag, and that if he had had spurs suitable for climbing a pole he could have ascended the snag and extinguished the fire. He added that he asked one of the defendant's men who was wearing a pair of spurs for their use, but that the request was denied. Paul R. Tappendorff, who was conducting some logging operations upon adjacent premises, testified that when he reached this place the fire was still confined in the snag, but that "it was blazing pretty lively, throwing fire all over." He testified that one of those present, Paul Reese, asked a member of the defendant's crew, called "Shorty," for the use of his climbers or a ladder, and testified that, while the crew was equipped with both, the request was denied with the explanation that "they were not allowed to loan out

their tools.'' He added that had he been permitted the use of either he could have extinguished the fire. Other witnesses testified that the fire was confined to the snag for about five minutes after the defendant's crew arrived.

The evidence indicates that a green hemlock tree contains a large quantity of moisture and ''is very hard to burn.'' Witnesses, however, who inspected the hemlock after it had been thrown to the ground testified that a portion of its branches and needles had been badly burned. A section of it which was introduced in evidence, and which is before us, corroborates their testimony. Electrical experts in the defendant's employ testified that a green hemlock is a good conductor of electricity.

About a quarter of a mile from the scene of this accident was a small sawmill. The refuse burner of this mill was equipped with a spark arrester, but was described as ''not a real burner.'' About 200 to 350 yards away a logger had a Fordson donkey engine. Its fuel was gasoline but it was not in use upon the day with which we are concerned.

Mr. T. H. Ness, city manager of the defendant, testified that the practice of power companies ''is to build our lines, cutting trees where it is possible to do so, so that the trees that are dangerous or lean towards the line or rotten or decayed in any way be cut down, and all green trees that have a tendency to whip into the line through the breezes are cut.'' J. W. Asplund, superintendent of the defendant, testified that whenever he drove along the road adjacent to this power line he inspected the right of way, took notice of all ''suspicious'' trees and frequently stopped for the purpose of examining trees that appeared dangerous. He testified: ''It is customary to clear a right of way and

to take out trees that are considered dangerous trees, but that doesn't mean every tree that may fall on the line." The court confined the plaintiff's proof to this one tree, but it incidentally developed that there were many tall trees in this immediate vicinity growing as near as 20 feet to the power lines. July 6 of the same year another tree in this vicinity fell across the same transmission lines and caused a fire.

The defendant's power house was equipped with an automatic circuit breaker or throwout switch which witnesses testified would instantaneously shut off a power line when a short circuit developed. This instrument was in operation at the aforementioned time and apparently shut off the power from the broken wires.

The plaintiff contends that the above evidence indicates that the contact between the hemlock tree and the defendant's wires started the fire which destroyed his property. The defendant insists that no such conclusion can fairly be drawn from the evidence. It is clear that the contact between the tree and the wires created at least a flash of fire. The charred branches which have become exhibits in the case themselves show that they were partially consumed by fire. The answer admits that the contact between the tree and the wires "ignited" the tree. The distance between the snag and the point where the wires broke was 88 feet. A strong wind was blowing from the hemlock towards the snag. Witnesses swore that they saw sparks and fire carried from the tree by the wind. Less than five minutes after the tree had fallen a smouldering fire was observed in the snag, and still later fire was blown from the snag to the ground, from whence it spread to the plaintiff's property.

█ Direct evidence is evidence which describes the disputed circumstance. It leaves no room for deduction or inference. Its sole demand is belief. When the latter is yielded the fact is established. Circumstantial evidence produces no witnesses who saw the questioned circumstance occur. It presents a series of facts related to the alleged principal fact, and, having placed them before the court as premises, suggests that they, together with the ordinary experiences of mankind, demand a conclusion that the alleged principal fact occurred. Circumstantial evidence fails its proponent if it comes from a source unworthy of belief, or if the premises cannot support the needed conclusion. It must also be sufficiently persuasive to negative all rival conclusions suggested by itself and which show nonliability in the opponent. For instance, if at the close of the presentation of the proof the circumstantial evidence is capable of supporting with equal reason two or more conclusions, one or more of which prove the nonliability of the opponent, the proponent has failed to discharge the burden of proof: Jones' Commentaries on Evidence (2d Ed.), § 12, footnote 20. Such a situation is similar to that produced by direct evidence which shows that the defendant or someone else committed the wrongful act.

█ It seems to us that the evidence, though circumstantial, was sufficient to justify the jury in believing that the defendant's transmission lines caused the fire. It is true that no witness traced the sparks in their flight from the fallen tree to the mossy place in the cedar snag. Such proof, had it been forthcoming, would have been direct evidence, but circumstantial evidence has sufficed in the locomotive spark cases, as well as in many others. The following brief review of several cases may be helpful in showing the effect of the evi-

dence presented by the record. In *Hartford Ins. Co. v. Central R. R. of Oregon,* 74 Or. 144 (144 P. 417), sparks from the defendant's locomotives could not have ignited the plaintiff's fruit dryer, which was a quarter of a mile distant, unless they were carried that far by the wind; yet it was held that the circumstances were for the jury's consideration. In *Hawley v. Sumpter Railway Co.,* 49 Or. 509 (90 P. 1106, 12 L. R. A. (N. S.) 526), this court, after declaring that "it has been held by many courts that fire discovered upon the right of way soon or immediately after the passing of an engine, where it is also shown that it cannot be reasonably inferred that the fire was caused in some other manner, creates an inference that the fire was caused by sparks of fire from the passing engine," held that the fact that a fire was not discovered until two and one-half hours after the defendant's train had passed did not necessarily destroy the inference that the defendant was responsible for it. In *Walters v. Iowa Electric Co.,* 203 Iowa 471 (212 N. W. 884), the facts were that some years previously the defendant had trimmed one of the branches from a large tree in front of the plaintiff's premises. The stub branch had since decayed. Upon the occasion in question the defendant's high tension wires which were somewhat slack were swayed into contact with the stub end branch and created a fire. The wind blew sparks in the direction of the plaintiff's corn crib, 150 feet away. The court found that the facts warranted an inference that the defendant was responsible for the fire. Without pausing to set forth our review of them, we cite *Newman v. Great Shoshone & Twin Falls Water P. Co.,* 28 Idaho 764 (156 P. 111), and *Roundtree v. Mt. Hood R. R. Co.,* 86 Or. 147 (168 P. 61), and *Richmond v. McNeil,* 31 Or. 342 (49 P. 879), as illustrative cases.

*Oregon Box etc. Co. v. Jones Lumber Co.,* 117 Or. 411 (244 P. 313), the importance of which the defendant stresses, contains nothing out of harmony with any of the foregoing. As noted above, the proof showed that a fire occurred in the portion of the hemlock which came into contact with the wires; that sparks were blown from it by the high wind in the direction of the snag, and that a few moments later a small smouldering fire was observed in the latter. However, as previously stated, if the proof with equal reason is capable of supporting other conclusions, hostile to the one favorable to the plaintiff, he has failed to sustain the burden of proof. The defendant urges that it is reasonable to infer that someone using the highway may have thrown a lighted cigar into the snag, that a logger may have done such an act, that the distant sawmill may have emitted a spark that was blown into the snag, or that the donkey engine, 150 yards away, may have caused this fire. It will be recalled that the fire was in the upper portion of the snag, which was 32 feet tall. It is quite unlikely that anyone would have thrown his burning tobacco into a place that high above the ground. Furthermore, the evidence fails to indicate the extent to which the road was used. Every passerby and logger mentioned by the witnesses became a witness, and if the defendant thought that any one of them started this conflagration it failed to disclose such a suspicion by asking the witnesses any questions concerning it. Moreover, section 42-427, Oregon Code 1930, renders it unlawful for anyone to throw any lighted tobacco upon any forest land or public highway during the closed season which is defined by section 42-409, Oregon Code 1930, as extending from May 15 to October 1. If the evidence supplied any basis for suspecting a passerby or logger, the presumption

"that the law has been obeyed" (section 9-807, subd. 34, Oregon Code 1930), when aided by the above sections of our laws, would negative the suspicion. We reject this suggestion as unwarranted by the circumstances. The sawmill was a quarter of a mile distant and the evidence fails to show whether the wind was blowing from it towards the snag or in the opposite direction. Nor does the evidence indicate how large a fire the mill employed in burning its refuse or the character of its spark arrester. Section 42-419, Oregon Code 1930, provides that every mill which burns refuse within one-fourth of a mile of any forest land shall provide itself with "a refuse burner adequate to prevent the spread of fire therefrom." Again applying the presumption that the law has been obeyed, as demanded by the above section of our code, it is impossible to assume that a spark was blown to the snag from the mill's refuse burner. Moreover, the mill was located on land lower than the place where this incident occurred with higher ground intervening. The separating distance, as well as the circumstances above mentioned, renders it impossible to believe that the mill caused the fire. The donkey engine was a Fordson which used gasoline to generate its power and was idle upon the day when this fire occurred. The above circumstances, in our opinion, justified the jury in believing that the contact between the wires and the tree caused this fire, and they likewise sufficiently negative all other rival causes of the fire so that one cannot attribute the fire to them.

It becomes necessary to consider what degree of care the defendant was required to exercise to assure safety in the transmission of electricity over its wires. It was its duty to foresee any contingency that reasonable foresight could anticipate. It was not necessary

that it should be able to foretell precisely the way in which an accident might occur through transmission of electricity: *Cooper v. North Coast Power Co.*, 117 Or. 652 (244 P. 665, 245 P. 317). It was incumbent upon it to anticipate the influence of ordinary storms upon its wires and the adjacent trees, and to construct its power lines in such a manner that they would not unnecessarily endanger the lives and property of others in such weather: *Boyd v. Portland General Electric Co.*, 40 Or. 126 (66 P. 576, 57 L. R. A. 619).

The required degree of care is always graduated according to the danger attendant upon the activity one is pursuing. The standard does not vary—it is the conduct of an ordinarily prudent person. But such an individual exercises care commensurate with the dangers to be avoided and the likelihood of injury to others. Such being true, it may be well to take note of the harmful quality of electricity. Electricity is a dangerous force whose destructive qualities are greatly facilitated by its subtle, invisible and mysterious nature. Since the plant where it is generated is often many miles distant from the place of consumption, the transmission lines frequently pass over country roads, city streets, through forests and other places where danger to life or property lurks if the electrical current escapes from the conduit. The length of the transmission wires renders impossible the character of supervision generally bestowed upon other dangerous substances.

In *Sander v. California-Oregon Power Co.*, 133 Or. 571 (291 P. 365), this court said:

"Those engaged in the transmission of such a dangerous commodity as electricity must exercise the utmost care in the construction and maintenance of the wires to avoid injury to those persons likely to come

into contact with them: *Perham v. Portland Electric Co.,* 33 Or. 451 (53 P. 14, 40 L. R. A. 799, 72 Am. St. Rep. 730); *McClaugherty v. Rogue River Electric Co.,* 73 Or. 135 (140 P. 64, 144 P. 569). The degree of care is commensurate with the danger involved. The defendant was not an insurer against accident, although it must be conceded that there are some cases which practically go to such an extreme position. Due care consists in guarding against probabilities—not possibilities.''

In *Saylor v. Enterprise Electric Co.,* 110 Or. 231 (222 P. 304, 223 P. 725), this court, in defining the degree of care exacted of one who is engaged in transmitting electricity along the public highways, employed many excerpts from the earlier decisions of this court, as well as from the decisions of other courts, which pointed out that such an individual is required to exercise a very high degree of care and prudence because of the dangers which lurk in electricity. In *Greenwood v. Eastern Oregon Power Co.,* 67 Or. 433 (136 P. 336), this court said:

''It was the duty of the defendant to have used care commensurate with the extremely dangerous character of the force it was engaged in transmitting in maintaining its wires at crossings as to minimize their danger to citizens lawfully using the public roads.''

In *Chaperon v. Portland Electric Co.,* 41 Or. 39 (67 P. 928), this court said:

''The defendant was engaged in the transmission and utilization of a subtle and dangerous energy over and along a public street by means of machinery and appliances * * *. The dangerous character of the business imposed upon the defendant a very high degree of care in the maintenance of its apparatus and appliances in a secure and safe condition, and thus to guard against the danger of accident to those in the lawful use and enjoyment of the street.''

Section 61-801, Oregon Code 1930, requires all wires for the transmission of electrical current to be installed in accord with the rules promulgated by the United States Bureau of Standards. That bureau has ordained that "where trees exist near supply-line conductors, they shall be trimmed, if practicable, so that neither movement of the trees nor the swinging or increased sagging of conductors in wind or ice storms or at high temperatures will bring about contact between the conductors and the trees."

In *Walters v. Iowa Electric Co.*, 203 Iowa 471 (212 N. W. 884), the facts were, as we have seen before, that the defendant's wires by coming into contact with a tree in front of the plaintiff's premises set the tree on fire, and this fire, upon spreading to the plaintiff's corn crib, caused him to sustain a loss. The court thus defined the degree of care which the defendant owed in the maintenance of its transmission lines:

"True, the defendant corporation was not an insurer, but it was its duty to use reasonable care commensurate with the danger to prevent the escape of electricity from its lines. In other words, in view of the highly dangerous character of an electrical current, which in this case is shown to be 33,000 voltage, the exercise of reasonable care on the part of the defendant involved a high degree of diligence and foresight in the construction and maintenance of its lines in a safe condition."

In *St. George Pulp & Paper Co. v. Southern New England Telephone Co.*, 91 Conn. 563 (100 Atl. 358), the facts were: The defendant maintained a telephone cable which, upon the occasion in question, came into contact with the roof of the plaintiff's building, thereby igniting it. At some distance from the plaintiff's plant the defendant's telephone cable employed a pole in

common with another company whose wires carried a powerful current of electricity. Upon the occasion in question the high voltage wires of the latter company transmitted a heavy charge of electricity into the defendant's telephone cable through the leaves and branches of a tree which stood alongside of the aforementioned common-user pole. The lower court sustained the defendant's motion for a nonsuit. In reversing the resulting judgment, the supreme court thus defined the duty which the defendant owed in the maintenance of its wires:

"The defendant, in carrying its wires through the city and placing them upon poles carrying high tension wires, was chargeable with knowledge that currents of high potential might be brought upon its cables by the branches of trees or other conductors coming in contact with such high tension wires and its own cables, and a very high duty was thus imposed upon it to prevent its wires from carrying such currents into the premises of its patrons and others where injury to persons or property might result."

In *Jeffress v. Virginia Ry. & Power Co.*, 127 Va. 694 (104 S. E. 393), wherein the plaintiff sought damages on account of the destruction of his home by fire which he claimed originated from the defendant's transmission lines, the court said:

"We have no difficulty in holding that the court erred in refusing to instruct the jury in clear and unmistakable terms, on behalf of the plaintiff, that persons engaged in the development and distribution of electricity are charged with the duty of exercising a high degree of care—a care commensurate with the danger of the instrumentality—and that if their failure to exercise such care results in injury to persons or property, a legal liability follows."

In *Rocca v. Tuolumne County Electric Power & Light Co.*, 76 Cal. App. 569 (245 P. 468), the facts

were that a tree, 83 feet tall, stood 33 feet from the defendant's power line, but upon private property. One of its limbs overhung the wires. Upon a stormy night this limb was broken from the trunk and, upon falling against the wires, caused them to sag to within a few feet of the ground. In the night time a pedestrian, upon coming into contact with the sagged wire, was killed. A judgment in favor of his estate was sustained. The decision of the court contains an excellent review of the authorities and states the measure of care required of power companies under such circumstances by quoting from *Fairbairn v. American River Electric Co.,* 170 Cal. 115 (148 P. 788), the following language:

"The standard to be attained is that of ordinary and reasonable care, and this means such care as a reasonably careful and prudent person, having in view the dangers to be avoided and the likelihood of injury therefrom, would exercise under the circumstances in order to prevent injury."

In *Alabama Power Co. v. Jackson,* 24 Ala. App. 86 (131 So. 244), a dead pine tree was blown down by a high wind and, striking the defendant's power wires, caused them to fall upon the highway and against the automobile of the plaintiff. The Alabama court in sustaining a judgment for the plaintiff held that the jury had a right to infer from these circumstances that the defendant had not exercised the required degree of care in the maintenance of its transmission lines. From Cooley on Torts (4th Ed.), § 499:

"Electricity is an invisible, impalpable force, highly dangerous to life and property, and those who make, sell, distribute, use or handle it are bound to exercise care in proportion to the danger involved. * * * Those using the public ways for electric wires carrying

dangerous current are bound to use a very high degree of care in the construction, use and repair of such lines to prevent injury to those lawfully upon such ways."

We quote from Shearman and Redfield on the Law of Negligence (6th Ed.), § 698:

"The business of supplying the public with electricity, like that of supplying gas for lighting or other purposes, involves the handling of a highly dangerous agent, and therefore, requires a corresponding degree of care on the part of one who undertakes it to prevent injury to persons lawfully in any place where his wires are strung whether over a highway or on a housetop. * * * The fact that other conditions must occur to render contact with electric wires dangerous cannot excuse their owner from taking reasonable care, in view of all the circumstances likely to occur to have the wires properly insulated."

For a collection of cases in harmony with the foregoing authorities, see 8 Texas Law Review 435.

 The defendant suggests that possibly a lesser degree of care suffices for prevention of injury to property than for prevention of injury to persons. It cites no authority in support of its contention. We have found none. Quite to the contrary, several of the cases reviewed above concerned injury to property and applied the above rules. The degree of care is proportioned to the injury-inflicting character of the element under one's control and is not determined by the character of the object, whether human, animal or property, which will be injured or destroyed if due care is not observed. Accordingly, we conclude that the defendant, in the performance of its duty to maintain its right of way safe for the transmission of electricity, was bound to exercise a degree of care commensurate with the highly dangerous commodity which it was conveying over its wires. This duty remained unper-

formed so long as it permitted trees to grow in such close proximity to its uninsulated wires that it, in the exercise of the judgment of a reasonably prudent person, should have known that the tree and the wires would come into contact in a manner that would endanger the safety of others or their property.

The defendant argues that a rule of law which would require power companies to fell all trees within striking distance of their transmission lines would work a great hardship in a state like ours where trees grow 200 feet tall. But the situation before us does not demand consideration of such a possible rule because it will be observed that the tree which caused this fire is readily distinguishable from the ordinary tree which is likely to be found adjacent to transmission lines. It was a sapling which, having grown tall when surrounded by other trees, was left exposed to the prevailing high wind. Its supporting trees had been removed by logging operations two years previously; in fact, before the high tension line was installed. Moreover, according to the defendant's answer, this tree "had been greatly weakened" by the logging operations and was "likely to fall." Its distance from the wires was somewhere between 20 and 50 feet. These being the circumstances, it appears to us that the evidence presented a proper basis for a finding that the exercise of due care demanded that the defendant should trim this tree, insulate its adjacent wires, set another pole for the support of its wires, or take some other precaution to protect the property of adjoining owners from danger. We have not overlooked the fact that the defendant's superintendent testified that he inspected the right of way every time he passed along this road, but even this testimony did not demand a ruling in its favor upon the motion for a directed

'verdict. The jury heard the testimony of the defendant's witnesses wherein they swore it was the practice of power companies to remove trees that endangered their lines wherever it was possible to do so. The degree of diligence which this practice demanded, and which was necessary to constitute the exercise of due care, was, partially at least, a question of fact for settlement by the jury's verdict: Shearman and Redfield on the Law of Negligence (6th Ed.), § 53.

We conclude that the first specification of negligence was capable of supporting a verdict in the plaintiff's favor.

The second specification accuses the defendant of having failed to use reasonable efforts to extinguish the fire after having received notice that it had started the fire. Section 42-410, Oregon Code 1930, provides:

"Any one who unlawfully sets on fire, or causes to be set on fire, any forest land * * * or any one who accidentally sets any fire on his own land or the land of another and allows it to escape from his control without extinguishing it, or using every possible effort so to do, or * * * shall be punished * * *."

Section 42-426 provides:

"Any one who shall accidentally set fire to any forest, woods, timber, brush, slashings, cut-over land * * * or any place from which fire may be communicated thereto, and shall not extinguish the same or use every possible effort so to do, * * * shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be punished by * * *."

Section 42-428 provides that, in addition to the penalties provided by the above sections of our laws, any one whose property is injured or destroyed by fires in violation of the above sections may recover in a civil action double the amount of the damages suffered by him.

■ This court has held repeatedly that violation of a statutory duty is negligence per se: *Noble v. Sears,* 122 Or. 162 (257 P. 809) ; *Santoro v. Brooks,* 121 Or. 425 (254 P. 1019) ; *Ross v. Willamette Valley Transfer Co.,* 119 Or. 395 (248 P. 1088); *Oregon Box & Mfg. Co. v. Jones Lumber Co.,* 117 Or. 411 (244 P. 313).

The defendant attacks the constitutionality of the above legislation and cites in support of its argument *Eastman v. Jennings-McRae Logging Co.,* 69 Or. 1 (138 P. 216, Ann. Cas. 1916A, 185), wherein this court held invalid an act which provided: "* * * but if such fires were caused or escaped accidentally or unavoidably civil action lies for only actual damages as determined by the value of the property injured or destroyed and the detriment to the land and vegetation thereof." This court held that since that act proposed to render liable in damages a property owner from whose premises fire had escaped in an unavoidable manner, it infringed the fifth and fourteenth amendments to the federal constitution. That act did not endeavor to prescribe a rule of care, but fixed a liability even though the fire's escape was unavoidable. The above two sections of our laws prescribe a rule of care for the protection of our grain fields and forests.

The defendant urges that the phrase "every possible effort" demands a degree of care which is unreasonable. It also argues that the evidence shows it had no notice that its wires had started this fire, and, since negligence assumes that the alleged tort feasor had knowledge of the facts which created the alleged duty (45 C. J., Negligence, p. 651, § 25), the defendant contends that it cannot be liable upon the second specification of negligence.

■■ A party is bound not only by what he knew but also by what he might have known had he exercised

ordinary diligence: *Cerrano v. Portland Ry. L. & P. Co.*, 62 Or. 421 (126 P. 37). It is not necessary that notice or knowledge of a condition should be proved by direct evidence. As was said in *Sherman v. Western Transp. Co.*, 62 Barb. (N. Y.) 150, "It may be, and almost universally is, inferred from the nature of the duty, or the facts and circumstances of the case."

■ Various items of evidence were before the jury for consideration in determining whether the defendant's crew, including the defendant's superintendent, had notice that the defendant was responsible for the blaze when it arrived at the place where the wires were broken and the snag was afire. For instance, there was: (1) the fallen hemlock charred at the point where it was leaning against the wires; (2) the strong wind blowing in the direction of the smouldering snag; (3) the telephone call which summoned the crew; (4) the two requests for spurs and a ladder; and (5) other facts visible to the crew. We believe that the evidence was sufficient to support a finding that the defendant knew that its broken wires had ignited this fire.

■ We come now to the defendant's criticism of the word "possible." Generally an absurdity can be created in the requirements of any legislation by placing upon the meaning of some word found in the act its most extreme meaning, and then pushing the selected interpretation to its furthermost limit. But the courts, in construing an enactment, presume that the legislature intended no absurd consequences and strive for a meaning that will prevent hardship and injustice: Lewis' Sutherland Statutory Construction (2d Ed.), §§ 489 and 490. It is axiomatic that if two constructions are equally available, one of which will sustain the validity of the act while the other will produce an ab-

surdity and render the act invalid, the former will be adopted: *Camas Stage Co. v. Kozer,* 104 Or. 600 (209 P. 95, 25 A. L. R. 27); *Leonard v. Ekwall,* 124 Or. 352 (264 P. 463); and *Othus v. Kozer,* 119 Or. 102 (248 P. 146). It seems clear that the legislature by the use of the single word "possible" did not intend to demand that those subject to the act should do things that were neither reasonable nor practicable. The dictionaries agree that practicable is a synonym for possible. The law dictionaries state that possible is sometimes construed as the equivalent in meaning of practicable or reasonable: Bouvier's Law Dictionary (Baldwin's edition) 957; Black's Law Dictionary (2d Ed.), 919. For a review of several instances where possible has been construed in such a manner, see 5 Words & Phrases, Third Series, p. 1132, and 49 C. J., p. 1118. It is our opinion that the words "every possible effort" exact everything that is practicable and reasonable, but no more.

 Clearly, the Legislature had a right to exact a higher degree of care than the standard conduct of a reasonably prudent person: *Sharkey v. Skilton,* 83 Conn. 503 (77 Atl. 950). Instances wherein such legislation, although demanding a very high degree of care, has been sustained are afforded in the judicial attitude toward employers' liability acts, traffic regulations, etc. The ancient common law rendered property owners liable in damages if fire spread from their premises to those of another and inflicted injury: 16 Ann. Cas., p. 941 (note) and 45 C. J., Negligence, p. 850, § 272. In recent years much legislation has survived attacks upon its constitutionality which imposed liability upon those from whose premises fire spread to those of another: 39 Yale Law Journal 433; *Campbell v. Missouri Pacific*

*Ry. Co.,* 121 Mo. 340 (25 S. W. 936, 25 L. R. A. 175, 42 Am. St. Rep. 530); *St. Louis, Etc., R. Co. v. Shore,* 89 Ark. 418 (117 S. W. 515, 16 Ann. Cas. 939), and 45 C. J., Negligence, p. 855, § 277. The courts have reasoned that where one of two innocent parties must suffer a fire loss it is just to hold responsible the one who started the fire, even though he was guilty of no wrongful act.

■ The defendant urges that its status as a public service company excused it from compliance with this statute until it had performed all of its other public duties. However, two idle wires which could be put into immediate use were upon the poles when its crew arrived for the purpose of repairing the broken lines. The only help requested of the defendant was the use of some spurs and a ladder; its repair crew possessed the needed equipment and was not using it. Public service companies are not exempted by the act from compliance with its terms. We believe that the above facts created an issue for determination by the jury whether the defendant, in view of the situation confronting it, could have performed the duty exacted by this law.

■■ We conclude that sections 42-410 and 42-426, Oregon Code 1930, are valid, and that the second specification of negligence was substantiated by proof.

We have carefully read and considered the instructions requested by the defendant and those given by the trial judge in lieu thereof. We find no error disclosed by these exceptions. The instructions given to the jury were in complete harmony with our understanding of the law applicable to this case as expressed above.

We have carefully considered all remaining contentions. Since they are governed by what we have already said, we deem it unnecessary to express specifically our review of them. Nor have we overlooked the authorities cited in the carefully prepared brief of defendant's attorney, and not mentioned herein.

We find no error in the record, and affirm the judgment of the circuit court.

BEAN, C. J., RAND and KELLY, JJ., concur.