Argued May 12, affirmed August 5, 1954

# TOPCO ASSOCIATES, INC. *v.* FIRST NATIONAL BANK OF PORTLAND
273 P. 2d 420

*Lamar Tooze,* of Portland, argued the cause for appellant. On the briefs were Tooze, Kerr, Hill & Tooze, Cake, Jaureguy & Hardy, and Denton G. Burdick, Jr., of Portland.

*R. R. Bullivant,* of Portland, argued the cause for respondent. With him on the brief were Pendergrass, Spackman & Bullivant and Charles E. Wright, of Portland.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, BRAND and PERRY, Justices.

PERRY, J.

This is an action at law by the plaintiff, Topco Associates, Inc. (formerly known as Food Coopera-

tives, Inc.) a Wisconsin corporation, against the defendant, The First National Bank of Portland, a national banking corporation, to recover the sum of $10,984.80. After a verdict had been returned by the jury in favor of the plaintiff, the defendant filed its motion for a judgment notwithstanding the verdict of the jury, or in the alternative for a new trial. The trial court having sustained the motion of the defendant for a judgment notwithstanding the verdict, the plaintiff has appealed.

The plaintiff suffered its loss in the sum of $10,-984.80 by reason of the fact that on January 31, 1949, the Starr Fruit Products Company, a canning concern operating several canneries, with its principal place of business in Portland, Oregon, drew a draft against Food Cooperative, Inc. (now Topco Associates, Inc.) in the amount above-mentioned, payable to the East Portland Branch of the defendant bank 20 days from date, and attached thereto its warehouse receipt in negotiable form, the warehouse receipt being in words and figures as follows:

"NEGOTIABLE
WAREHOUSE RECEIPT
ISSUED BY
STARR FRUIT PRODUCTS COMPANY
Office 105 S.E. Yamhill Street
PORTLAND, OREGON

No. 203          Portland, Oregon. January 31, 1949

Received from Starr Fruit Products Co., Sunnyside, Wn. for storage the following described goods to be delivered to Fred Meyer, Inc., or order, on surrender of this receipt properly endorsed and on payment of storage advances and all other charges.

STARR FRUIT PRODUCTS COMPANY,

By _____

| Marks or No. | No. of Pkgs. | |
|---|---|---|
| | 2000 | 24/2 ½ Standard in L.S. Pears "TRIUMPH" |

The above described goods are received subject to the following conditions: Loss or damage by riot, fire, flood, rottage, moth, leakage or from inherent quality of the property at owners risk. In case of threatened inundation, the Starr Fruit Products Company will remove goods at the expense of the owners."

The defendant bank purchased the draft, depositing the purchase moneys for the draft to the account of the Starr Fruit Products Company. Thereupon, the draft with the negotiable warehouse receipt attached was forwarded for collection, and was duly presented to and accepted by the plaintiff on February 3, 1949. On February 21, 1949, the plaintiff, upon delivery to it of the warehouse receipt and invoice, paid the face amount of the draft to the Harris Trust & Savings Bank, Chicago, Illinois, and the latter bank remitted said funds to the Continental-Illinois National Bank & Trust Company of Chicago, the last-named bank crediting the account of the defendant bank with the sum of $10,984.80.

The plaintiff, Topco Associates, Inc., in attempting a purchase of the goods set out in the warehouse receipt, was purchasing for Fred Meyer, Inc., Portland, Oregon, a member of the association. Fred Meyer, Inc., did not receive the goods listed in the warehouse receipt, and subsequently Starr Fruit Products Company became insolvent.

The draft purchased by the defendant was in itself regular, and the warehouse receipt accompanying the draft was regular upon its face; it was only later, after

the plaintiff had unconditionally accepted and paid the draft, that it was learned that the receipt was "spurious", there being no goods of the description named therein warehoused and set aside by the Starr Fruit Products Company at its cannery in Sunnyside, Washington.

The draft purchased by the defendant and the warehouse receipt accompanying the draft are two separate and distinct instruments. The negotiable warehouse receipt is governed by the Uniform Warehouse Receipts Act, § 60-246, OCLA, now ORS 74.460, of that Act providing as follows:

> "A mortgagee, pledgee, or holder for security of a receipt who in good faith demands or receives payment of the debt for which such receipt is security, whether from a party to a draft drawn for such debt or from any other person, shall not by so doing be deemed to represent or to warrant the genuineness of such receipt or the quantity or quality of the goods therein described."

And the draft, or bill of exchange, is governed by our Negotiable Instruments Act.

That the defendant in this case was a holder for value is not challenged, but it is charged that by reason of the circumstances involving the warehouse receipt, which was spurious, the defendant was not a holder in due course of the draft. The Negotiable Instruments Act in § 69-402, OCLA, now ORS 71.052 defines a "holder in due course" as follows:

> "A holder in due course is a holder who has taken the instrument under the following conditions: (1) that it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that

at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.''

It is to be noted that under the Uniform Warehouse Receipts Act no warranty is made by the holder thereof as to the genuineness of the receipt, or the quality or quantity of the goods therein described. Nevertheless, whenever the warehouse receipt is attached to or does accompany a bill of exchange, the statute only resolves itself in favor of one who has received payment of the draft or bill of exchange in ''good faith''.

■ Regarding the bill of exchange, § 69-406, OCLA, now ORS 71.056, provides as follows:

"To constitute *notice of an infirmity in the instrument* or *defect in the title of the person negotiating the same,* the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." (Italics ours.)

While this statute concerns itself directly with an infirmity in a bill of exchange, nevertheless, we are of the opinion that the infirmity of the warehouse receipt must constitute the infirmity in the bill of exchange if the plaintiff is to recover; therefore, the bad faith of a holder of a negotiable instrument with security attached is to be governed by the notice and knowledge as defined in this statute. This reasoning seems to accord with the conclusion reached in Restatement of the Law, 136, Restitution, § 32, wherein the rule is laid down regarding restitution from the holder of a bill of exchange with security attached who has paid value and received payment therefor, the rule being stated as follows:

"The holder of a bill of exchange who has paid value and receives payment therefor from the

drawee *without reason to know that an accompanying security* is spurious or defective in whole or in part is under no duty of restitution to the drawee of the bill who makes payment in reliance upon the security." (Italics ours.)

Likewise, it coincides with the rule as laid down in 8 Am Jur 497, Bills and Notes, § 856, which reads as follows:

"The authorities almost without exception hold that the drawee of a draft with bill of lading attached, who has accepted unconditionally, and has paid the draft, cannot, upon discovering that the bill of lading is forged, recover the money so paid from a payee or indorsee who has not guaranteed the genuineness of the bill of lading nor *known of the fraudulent character thereof.*" (Italics ours.)

See also: 10 CJS 1014-1015, Bills and Notes, § 467; 2 Williston on Sales, Rev ed 628-631, Documents of Title, § 435.

The rule in American Jurisprudence is apparently limited to forged bills of lading. However, we are unable to see wherein the rule would be different where the fraud is committed upon an innocent drawee through the execution of a false warehouse receipt instead of by a forged bill of lading.

■ The plaintiff in this case relies up the exceptions to an accepted general rule of law laid down by Lord Mansfield in *Price v. Neal,* 3 Burr 1354, the exception being that the doctrine of *Price v. Neal* will not avail a holder who is guilty of bad faith or who has been negligent. "The general statement that a drawee who pays a bill of exchange or check does so at his peril, is not strictly accurate, for it is subject to qualification and exception. The general language employed in this statement fails to take into account any of the duties resting upon the holder. The doctrine of *Price v. Neal*

is not available to a holder who (1) is guilty of bad faith, or (2) has been negligent. The rule with which we are now concerned is more accurately stated when we say that a drawee who has paid a bill of exchange or check cannot recover the payment from a holder in good faith for value and without fault. The holder is guilty of bad faith towards the drawee and must refund if he participated in the forgery, or if he knew the check was forged, or knew of circumstances causing suspicion of its genuineness and these circumstances were neither known to the drawee nor communicated to him by the holder." *First Nat. Bk v. United States Nat. Bk.,* 100 Or 264, 275, 197 P 547, 14 ALR 479.

■ The courts have, generally, (as has this court) rejected the defense of negligence and constructive notice of such facts as would put a purchaser upon notice where the purchaser of a negotiable instrument is a purchaser for value. "The strictness of the general equity doctrine of constructive notice is not applied to a purchaser for value of negotiable instruments before maturity. Such purchaser is not 'put upon inquiry' by suspicion, by knowledge of such facts as ought to put an ordinarily prudent man upon inquiry, nor by negligence. He is not required to busy himself inquiring about infirmities or searching for defects. Only knowledge of such facts as would make his purchase an act of bad faith is sufficient to impeach his title as a holder in due course. Prudence is not the criterion: *First Nat. Bank v. Moore,* 148 Fed. 953; *Amalgamated Sug. Co. v. U.S. Nat. Bank,* 187 Fed. 746; *Bank of Jordan Valley v. Duncan,* 105 Or 105 (209 Pac. 149); *Downs v. Horton,* 287 Mo. 414 (230 S.W. 103, Aff'd. 209 S.W. 595), 3 RCL, §§ 277, 278, pp. 1071, 1074. The question is one of good faith or bad faith, honesty or

40

dishonesty: *Bowman v. Metzger*, 27 Or 23, 29, 31 (39 Pac. 3); Brannan's Neg. Insts. Law, 4 Ed. pp. 446, 452." *Bk. of Cal. etc. v. Portland H. & W. Co.*, 131 OR 123, 138, 282 P 99. Therefore, it seems quite clear in this case that the bad faith of the defendant must consist of facts showing that the defendant actually knew the spurious character of the warehouse receipt, or was possessed of facts sufficient to create the belief, or an unavoidable inference, that the warehouse receipt was spurious, making the defendant's purchase thereof dishonest and resulting in the perpetration of a fraud upon the plaintiff. To hold otherwise would be to do violence to § 69-406, OCLA, now ORS 71.056.

■ No citation of authority is needed for the statement that, if there is not goods behind a negotiable warehouse receipt, it is a nullity. However, the question that confronted the trial court and now confronts this court is: Did the defendant bank know of this fact or did it have sufficient knowledge of facts to create the belief, or an unavoidable inference, that the warehouse receipt was spurious?

With these rules of law in mind, we shall now examine the evidence relied upon by the plaintiff to show knowledge of the spurious character of the warehouse receipt sufficient to create the bad faith of the defendant.

There is ample evidence that at the time of the issuance of the warehouse receipt by the Starr Fruit Products Company and the purchase of the draft by the defendant bank, goods were not set aside and warehoused as demanded by the warehouse receipt. There is also ample evidence that the officers of the Starr Fruit Products Company in Portland at the time of the issuance of the warehouse receipt and draft knew of this fact from the inventory of the goods on hand

at the Sunnyside operation, which information they had received from their employee, Mr. Morrow, for they forwarded to their employee shipping orders relative to these pears with the notation thereon: "To be set aside and marked for Fred Meyer, Inc., when packed." The bank, however, denied knowledge of the contents of the Starr Fruit Products Company inventory of canned goods at Sunnyside, Washington, or of the shipping order.

The defendant bank through its East Portland Branch had for a number of years been financing the Starr Fruit Products Company, and in April, 1948, the defendant bank, having granted additional credit to the Starr Fruit Products Company, advised its East Portland Branch of the manner in which the new money should be handled and as to its desires concerning the supervision and liquidation of all of the indebtedness of the Starr Fruit Products Company to the bank, its letter of instructions being as follows:

"April 2, 1948

"A A [.] Lesseg, Manager
East Portland Branch

"Dear Mr. Lesseg:

"This will confirm our recent telephone conversation in connection with the Starr Fruit Products Company application for further advance of $56,257.00 which is only to be advanced as follows:

"The company as per their flow sheet have raised $40,500.00 new money which is to be put into the company. After this amount has been deposited, we will then advance $35,000.00 of the $56,257.00, which is to be disbursed as per their flow sheet and to be secured in the following manner:

"1—Assignment of their growers' notes and chattel mortgages covering advances of strawberry crops to be harvested in the next 90 days, together with assignment of the fruit contract covering the berry

acreage. You have a schedule of these growers and you will note that a portion of the advances are by open account. These are to be reduced to notes as rapidly as possible and placed with you. Meantime, however, we will execute an assignment of these accounts and also stamp their ledger with the legend: 'This account assigned to The First National Bank of Portland.' Incidentally, as the balance of the commitment for $21,257.00 is advanced over the ensuing six weeks the company will present to you growers' notes covering these new advances in like amount. These further advances will complete the 1948 growing program and are likewise referred to on your schedule of such accounts under additional supplies and cash requirements.

"2—We are to receive the personal endorsements of Mr. B. E. McCaughorn and H. G. Hohweisner, the owners. This guarantee is to cover the entire indebtness [sic], that is, the amount now owing plus our additional advances.

"3—We will take a chattel mortgage covering all of their plant and equipment including lug boxes and machinery wherever situated. In other words, they have plants in Salem, Portland, Yakima and also some lug boxes stored at Mosier, Oregon [,] so we should be sure to cover everything at these points.

"4—The bank will attempt to follow the operations of the company very closely to see that the proceeds of all collateral liquidated are applied to our notes and that the income and disbursements follow the program outlined on the flow sheet.

"5—In order to further protect our advances, it is our thought that you should deposit the money in a bancontrol account, over which they have no power of withdrawal, and then as they bring in their list of accounts for payment in accordance with the flow sheet you could make the transfer from the bancontrol account to their general account.

"6—We should also have an understanding with

them that there will be no capital expenditures whatsoever without prior consent of the bank. This of course means purchases of equipment, lug boxes, or any items purchased in connection with their general packing operations.

"7—Further, we should have an understanding with them that on all expenditures over $500.00 for operating supplies they should discuss them with you in order that we can be sure they are not endeavoring to cover their requirements too far in advance. In other words, the company is working on a very narrow working capital margin, and we want to see that they use every effort to conserve their cash. "8—The officer should furnish you with a list of their salaries and if you feel that they are inany way [sic] excessive we would appreciate your discussing them with us. In other words [,] we feel they should be just as interested in conserving cash because after all it is their company.

"As you know, Mr. Jack Washburn of our Credit Department has been assigned to follow this account. He will assist you in every way possible, since the entire operation will require our very close supervision for the next 3 or 4 months, at which time it is anticipated their entire indebtedness will be liquidated in full. In closing, I might add it would be well to see that the company gets in writing their commitment from the R F C, who incidentally presently hold a first mortgage on plant equipment to the extent of $83,000.00 [,] confirming their agreement to release 50% cash proceeds of the value of all equipment sold until such time as the company receives $40,000.00. Also we should check and determine that the $65,000.00, or thereabouts, in notes to be given to general creditors are mailed out promptly.

"David S. Adolph"

Mr. Adolph, who signed the above letter, prior to his becoming a vice president of the defendant bank, had, during the calendar year 1947, been the vice president of the Starr Fruit Products Company, acting for

and on behalf of that company in negotiating financial matters with the defendant bank, and during that period of time he had tried to learn the general operations of the canning company.

It appears from an exhibit in this case that a "flow sheet", as that term is used in paragraph number 4 of the above letter, is a statement of money requirements of a borrower showing his proposed expenditures, his anticipated sales, and the profit to be derived from a given operation.

The officers of the bank testified that the instructions in the letter were followed, and that Mr. Washburn, as the agent of the bank, was in contact with the officers of the Starr Fruit Products Company at its main office in Portland. Mr. Washburn, the agent of the bank, furnished the bank with a weekly report of the situation of the liquidation of the debt with comments on the company's operations. On October 25, 1948, he reported as follows:

"According to the figures presented to the Bank from Starr Fruit, their first pear pack, which was a small pack consisting of 3,700 cases of Bartlett pears, was completed Monday of this week and showed a very satisfactory profit. In addition to covering their overhead they netted $5,600. The company is now packing the D'Anjou and Bosc pears. They have at present firm orders for 75,000 cases, which will net the company $75,000 profit.

"The company shipments have been a little slow due to the water front strike, difficulty in obtaining buyers' labels, and most recently the lack of freight cars."

On November 1, 1948, Mr. Washburn reported the following:

"The company's pack of D'Anjou and Bosc pears is progressing satisfactorily and according to schedule."

The defendant bank had previously received information that the Company's pear pack for the year 1948 would in all probability start in October and be completed by November 30th in that year. On November 12, 1948, Mr. Miller, the assistant manager of the East Portland Branch, made the following report to the defendant:

> "For the past several weeks a representative of the East Portland Branch, has been meeting daily with the principals of the company in order to follow closely liquidation of the bank debt and their progress otherwise. It still appears that liquidation will continue satisfactorily.
>
> "The company is becoming increasingly optimistic, whereas ninety days ago they thought only about liquidation, they now talk about their ability to operate next year."

On January 31, 1949, the date of the issuance of the warehouse receipt and the purchase of the draft in question, Mr. Washburn reported to the defendant bank on the information he had obtained during the prior week as follows:

> "Starr Fruit is starting its pear pack, consisting of approximately 500 tons of pears, on February 7th. The company has confirmed order for all of this pack.
>
> "The company has started receiving confirmed orders for their strawberry preserves which is the result of the samples that were recently sent out to prospective buyers. So far they have received orders for 2100 cases of strawberry preserves, which amounts to approximately $13,000.
>
> "Starr Fruit also has over $15,000 worth of orders for their cherries and boysenberries, but due to the slowness in the market, buyers have not as yet given shipping instructions.

"The company has submitted their formal application to R.F.C. for the $100,000 capital loan. They were informed by R.F.C. that it would be approximately three weeks before they could expect a decision."

The defendant bank kept a warehouse loan condition report of its borrower, Starr Fruit Products Company, the detailed description of the collateral held as of January 15, 1949, being as follows:

"Borrower Starr Fruit Products Co., The First National Bank Branch (No. —) "WAREHOUSE LOAN CONDITION REPORT As of Close of Business January 15, 1949

| | SECURITY | | | LOANS | | |
|---|---|---|---|---|---|---|
| Commodity | Value of Collateral Pledged Under W/R | Collateral Outstanding on Trust Receipt | Total Value of Collateral | Balance due (W/R Loan only) | Inter-est Paid to | Ratio: loan to Collat-eral |
| Canned Goods | 59478.04 | | 59478.04 | 54464.90 | | |
| Frozen goods | 54229.65 | | 54229.65 | 51174.21 | | |
| Packing Supplies | 23671.52 | | 23671.52 | 18843.95 | | |
| Sugar | 2876.23 | | 2876.23 | 2876.23 | | |
| Cherries in brine | 3655.00 | | 3655.00 | 2924.00 | | |
| Accrued Storage and Other Prior Liens | | | xxxx | | xxxx | xxxx |
| Total | 143910.44 | | 143910.44 | 130283.29 | xxxx | |

Based on valuation obtained from ....................... under date of 1-15-49

Loan balance secured by warehouse receipts, previous report dated 12-15-48 .................. $142,320.80

New loans secured by warehouse receipts $ None (EXCLUDE RENEWALS)

Loans paid secured by warehouse receipts $12,037.51 Balance secured by warehouse receipts (this report) $130,283.29

Detailed Description of Collateral (Omit collateral outstanding on Trust Receipt)

| Commodity | Date Produced | Variety | Grade | Size | Quantity | Unit | Unit Value | Value of Collateral |
|---|---|---|---|---|---|---|---|---|
| Empty Barrels | | | | 50 Gal | 1150 | each | 4.00 | 4600.00 |
| Cherries | 1948 | Glace | | 35#Pail | 10 | each | 9.00 | 90.00 |
| Strawberries | 1948 | Marshalls | 4 x 1 | Bbls | 189 | each | 96.00 | 18144.00 |
| Strawberries | 1948 | Marshalls | 4 x 1 | Bbls | 307 | each | 96.00 | 29472.00 |
| Strawberries | 1948 | Marshalls | 4 x 1 | Bbls | 36 | each | 96.00 | 3456.00 |
| Cherries | 1948 | R.A. | In Brine | Bbls | 43 | each | 85.00 | 3655.00 |
| Prune Plums | 1948 | | Fancy | 48/1 | 270 | case | 5.80 | 1566.00 |
| Cherries | 1948 | R.A. | Fancy | 24/1 | 136 | case | 5.34 | 726.24 |
| Cherries | 1948 | R.A. | Fancy | 48/8 | 94 | case | 6.60 | 620.40 |
| Cherries | 1948 | R.A. | Fancy | 24/2 | 200 | case | 6.80 | 1359.50 |
| Cherries | 1948 | D.S. | Fancy | 24/2 | 2 | case | 6.70 | 13.40 |
| Juice | 1947 | Loganberry | Fancy | 24/12oz | 505 | case | 3.65 | 1843.25 |
| Loganberries | 1948 | | Water | 6/10 | 1400 | case | 7.12½ | 9975.00 |
| Boysanberries | 1948 | '' | Fancy | 48/1 | 200 | case | 9.40 | 1880.00 |
| Boysanberries | 1948 | | Choice | 48/1 | 250 | case | 9.00 | 2250.00 |
| Maraschino | 1947 | Cherries | Fancy | 12/28oz | 135 | case | 8.75 | 1181.25 |
| Maraschino | 1947 | Cherries | Crushed | 4/10 | 50 | case | 7.00 | 350.00 |
| Cherries | 1947 | Glace | W & B | Bbls | 15600# | Lb | .41 | 6396.00 |
| Peaches | 1947 | Sliced | Fancy | 24/2 ½ | 330 | case | 7.20 | 2376.00 |
| Peaches | 1947 | Elberta | Fancy | 24/2 | 405 | case | 5.30 | 2146.50 |
| Pears | 1947 | Bartlett | Fancy | 24/2 ½ | 1296 | case | 8.10 | 10497.60 |
| Pears | 1947 | Bartlett | Standard | 24/2 ½ | 71 | case | 6.60 | 468.60 |
| Pears | 1947 | Bartlett | Salad | 24/2 ½ | 1770 | case | 6.00 | 10620.00 |
| Pears | 1947 | Bartlett | Fancy | 24/2 | 846 | case | 6.05 | 5118.30 |
| Loganberries | 1947 | Frozen | Straight | Bbl | 19500# | Lb | .13 | 2535.00 |
| Blackberries | 1947 | Frozen | Straight | Bbl | 3750# | Lb | .15½ | 581.25 |
| Blackberries | 1947 | Frozen | Fancy | 24/1# | 6 | case | 6.90 | 41.40 |
| Glucose | 1947 | Confectioners | Sugar | Drums | 41207# | cwt | 6.98 | 2876.23 |
| Cartons | 1947 | Mixed Fruit | Containers | 1# | 617500 | M | 18.63 | 11504.03 |
| Caps | 1947 | #55 L/2XCL | | 1# | 119000 | M | 7.20 | 856.80 |
| Caps | 1947 | #66 XCL | | #303 | 126700 | M | 8.31 | 1052.87 |
| Caps | 1947 | #66 PT | | #303 | 116600 | M | 7.73 | 901.32 |
| Glass | 1947 | In Cartons | | 24/10oz | 10500 | each | .453 | 4756.50 |
| Totals | | | | | | | | |

ANSWER FOLLOWING QUESTIONS IF NOT
COVERED IN PREVIOUS REPORT:

Name of warehouse ................................... Are receipts
   negotiable? ...................... Risks covered by insurance
   ...................... Commitment (loan basis in terms of
   % of value) ...................... Commodity released for
   ..........% of value

Remarks: (List balance due and value of collateral, if
   any, of loans other than on warehouse receipt basis).

| Type | Balance Due | Collateral Value |
|------|-------------|------------------|
| UT'S | 7,914.99 | |
| WT'S | 130,283.29 | 143,910.44 |
| DTI'S | 59,515.67 | |

With reference to the record of warehouse receipts
which were pledged to the defendant bank by the Starr
Fruit Products Company, Mr. Miller, assistant man-
ager and later manager of the East Portland Branch
of the defendant bank, testified as follows:

"Q  What record did you have, Mr. Miller, to keep
a record of the warehouse receipts which were
pledged to the bank by Starr Fruit Products
Company?

"A  We have a warehouse loan condition report
that we made out once a month, the 15th of
each month.

"Q  Does that warehouse loan condition report de-
scribe in detail the goods behind each receipt,
or just a lump amount?

"A  No, it shows exactly the goods. It would not
show behind each individual receipt.

"Q  That is what I mean. Does it describe each
individual receipt?

"A  No, it would not.

"Q Did you have a record which would show that, the individual receipts and the description of the goods behind it?

"A Yes, we did have a record, and you asked for those records and I had a very diligent search made, and my chief clerk said he felt sure it had been destroyed. We have certain records that we must keep forever, and it happens that these records only have to be kept a year, and he thinks they destroyed them.

"MR. BULLIVANT: Did the witness finish his response?

"Q (By Mr. Tooze) Did you finish?

"A Yes. Those records were destroyed.

"Q Do you know when they were destroyed?

"A That I do not know."

It is to be noted that the above report of warehouse inventory was kept only upon goods pledged to the defendant bank by the Starr Fruit Products Company. There is no contention that this record covered goods warehoused at Sunnyside, Washington, the pear operation at Sunnyside having been financed through a loan with the Reconstruction Finance Corporation, which corporation had taken as collateral security the fruits and vegetables processed at the company's plant in Sunnyside, Washington.

On January 19, 1949, the defendant bank attempted to obtain from the Starr Fruit Products Company an assignment of all of its interest in warehouse receipts describing canned goods and vegetables subject to the rights of the R.F.C., this, of course, being in contemplation of receiving this additional security when the indebtedness owing to the R.F.C. was by the canning company paid in full. The R.F.C. refused to recognize this assignment. The assignment, drafted by an at-

torney and officer of the defendant bank and executed by officers of the Starr Fruit Products Company, does not set forth the warehouse receipts describing the canned fruits and vegetables pledged by the canning company to the R.F.C., and the attorney, an officer of the defendant bank, who drafted the instrument, denied knowledge of the contents of the warehouse receipts pledged to the R.F.C.

Later events disclose that a Lawrence Warehouse Company receipt dated November 23, 1948, covering 1,927 cases of 24/2 ½ standard pears located at Sunnyside, was transmitted by the R.F.C. to the defendant bank on May 11, 1949, and 1,778 cases of pears covered in this receipt were actually transferred to the defendant bank on June 22, 1949.

The record likewise discloses that on the date the draft was purchased by the defendant bank, the account of the Starr Fruit Products Company with the defendant bank was overdrawn to the extent of $1,478.52, and without the deposit of the proceeds of the draft the account would have been overdrawn by checks presented to the defendant bank, if honored, to the extent of $4,859.98.

The record also shows that Mr. Miller, the assistant branch manager of the defendant bank, approved the purchase of the draft in question in this case, and prior to its purchase, with the warehouse receipt and invoice attached, directed an inquiry regarding this matter over the telephone to Mr. Ross, secretary-treasurer of the Starr Fruit Products Company. The tenor of that conversation is not given as Mr. Miller could not recall what was said and Mr. Ross was not called as a witness by either party.

These are the facts and circumstances elicited by the plaintiff from adverse witnesses, and are the facts

and circumstances relied upon by the plaintiff to show the knowledge of the bank that the warehouse receipt accompanying the draft was spurious.

■ Circumstantial evidence, of course, may establish a fact as well as direct evidence, but where one relies upon circumstantial evidence from which reasonable deductions may be drawn to establish a fact by inference, the inference "must also be sufficiently persuasive to negative all rival conclusions suggested by itself and which show nonliability in the opponent. For instance, if at the close of the presentation of the proof the circumstantial evidence is capable of supporting with equal reason two or more conclusions, one or more of which prove the nonliability of the opponent, the proponent has failed to discharge the burden of proof." *Sullivan v. Mount. States Power Co.,* 139 Or 282, 294, 9 P2d 1038. See also: *Annereau v. Ewauna Box Co.,* 176 Or 509, 517, 159 P2d 215. In other words, the circumstances from which a deduction may arise are not sufficient to sustain the burden of proof if they are susceptible of explanation on any other hypothesis fairly and reasonably deductible from the evidence as opposed to the result sought by the party to be benefited thereby.

The situation here shows (1) that the Starr Fruit Products Company was in a serious financial condition; (2) that the defendant bank was attempting to follow the operations of the company very closely to see that the collateral pledged to the bank was properly liquidated and applied to the notes held by the bank, and that some particular operation of the company (not the canning of pears) followed as closely as possible the program previously outlined by the company in its flow sheet; (3) that the defendant bank was advised through its Mr. Washburn that the Starr Fruit Products Company was packing pears at its Sunny-

side operation; (4) that the R.F.C. had provided the funds for this operation and held as collateral security for the loan the canned goods packed; and (5) that the defendant bank obtained from the Starr Fruit Products Company an assignment of its interest in the canned goods and vegetables subject to the rights of the R.F.C., and attempted to obtain the R.F.C.'s acceptance of this agreement which provided that the R.F.C. would not discharge or release any of the collateral held by the R.F.C. on its loan without prior consent of the bank; the R.F.C. refused to approve or recognize this agreement.

The above facts clearly show that the bank was closely following the general operations of the Starr Fruit Products Company, keeping close track of all warehoused products which they held as collateral security. There is a total lack of those same records in the files of the bank regarding the pear operations of the company at Sunnyside. The evidence, therefore, is equally conducive to the hypothesis that the bank did not have full knowledge of the condition of stored goods in the warehouse at Sunnyside.

■ We must reach the conclusion that the plaintiff failed to sustain the burden of proof necessary for a restitution of its money from the defendant. The judgment of the trial court is affirmed.