Argued May 12, reversed and remanded June 8, opinion corrected, petition for rehearing denied July 6, 1960

# EHLER ET UX *v.* PORTLAND GAS & COKE COMPANY

352 P. 2d 1102
353 P. 2d 864

GLEN HIEBER, Judge.

*Thomas A. Huffman* argued the cause for appellants. On the briefs were Schwenn, Brink & Huffman, Hillsboro.

*Henry Gray* and *Gerald Norville,* Portland, argued the cause for respondent. On the brief with Gerald Norville were Smith, Gray, Hill & Rodgers, Portland, and Hare, Sturgis & Burdett, Hillsboro.

Before McALLISTER, Chief Justice, and WARNER, SLOAN, O'CONNELL and MILLARD, Justices.

MILLARD, J. (Pro Tempore)

This is an appeal by plaintiffs from an order allowing defendant's motion for a judgment notwithstanding the verdict and granting defendant's motion for a new trial and from an order *nunc pro tunc* allowing a motion for new trial. The verdict of the jury in the sum of $13,128.50 resulted from the trial of an action wherein these plaintiffs were claiming damages for the burning of their home as a result of the escape of gas from piping owned by defendant located on plaintiffs' property.

■ For their first assignment plaintiffs contend that the trial court erred in allowing the entry of an order granting a judgment notwithstanding the verdict and a new trial. We will first deal with that portion relating to the judgment notwithstanding the verdict. A motion for judgment n.o.v. admits the truth of the prevailing parties' evidence and every favorable inference that may be drawn therefrom, as well as every inference favorable to the prevailing party as may be drawn from the evidence of the party who, by his motion, seeks such judgment. *United Finance Co. v. Kliks*, 210 Or 288, 291, 310 P2d 1103. It is, therefore, incumbent upon us to examine the evidence in the light most favorable to plaintiff, having in mind the issues tendered by the pleadings. The complaint, after alleging the marital relationship of plaintiffs, the corporate existence of defendant, and the ownership by plaintiffs of the real property, states that plaintiffs' 14-room house and contents burned, being of the value of $13,128.50, and that the direct and proximate cause of the fire and resulting damage was the negligence of defendant in three particulars as hereinafter set forth:

"(1) That more than two years prior to the fire

in question, the exact time being to these plaintiffs unknown, a gas pipe had been installed by the defendant company, running from the county road to the edge of the plaintiff's house for the purpose of directing manufactured gas thereto, and that from the said pipe, a stand pipe was erected at right angles and rose above the ground, with a shut-off valve therein; that the said stand pipe was capped, but that the pipe itself and the valve were defectively installed, so that at the time of capping, the exact time being to these plaintiffs unknown, manufactured gas from the defendants' gas line, consistently escaped therefrom in quantities sufficient to constitute an extreme hazard.

"(2) That in the early morning hours of September 22, 1952, the Ehler residence caught fire, the exact source thereof being to these plaintiffs unknown, but that the gas escaping from the stand pipe above mentioned, immediately caught fire and played upon the side of and underneath the house of the plaintiffs, so that a continuous torch of flame was applied thereto, and caused the said structure to burn to the ground.

"(3) That the defendant was negligent in not maintaining its service line to the hereinabove described property of the plaintiffs after having received notice that gas was escaping from in and around the standpipe located on the premises of plaintiffs, which said standpipe was owned and under the control of the defendant."

Plaintiffs then allege that as a sole and proximate result of this negligence of defendant, plaintiffs were damaged $13,128.50. Defendant's answer consists of a denial, with the exception of admissions to the effect that the house and contents burned to the ground and that two years prior to the fire a gas pipe had been installed by defendant, running from the county road to the edge of plaintiffs' house, for the purpose

of directing manufactured gas to said house, and that from said gas pipe a stand pipe was erected at right angles and rose above the ground with a shut-off valve thereon and that said stand pipe was capped and that in the early morning hours of September 22, 1952, the residence caught fire at the time alleged. The defendant also set forth in its answer a plea of contributory negligence wherein it is alleged that plaintiffs were negligent in constructing part of the residence over the riser without having the gas disconnected, knowing that gas was escaping, if such was the fact, in failing to notify defendant of the construction, and in failing to shut off the gas line and disconnect it. This affirmative defense was by agreement deemed denied by plaintiffs. It should be further noted that by stipulation it was agreed that the pipe and riser were the property of the defendant.

From the evidence it appears that plaintiffs bought the property before 1950. At that time plaintiffs, having a large family, started the construction of a new addition to the house so that at the time of the fire it was of the size alleged. At the northwest corner of the old dwelling was located the kitchen, which faced north, the north and south walls being about 24 feet long and the east and west walls about 16 feet wide. At the northwest corner of the kitchen and to the west thereof and outside was the riser heretofore mentioned. It was capped, the meter removed, and the valve which was about half way down the pipe was turned off by defendant at plaintiffs' request at the time construction of the new addition was commenced, since gas was no longer used in the dwelling. Plaintiff John B. Ehler testified that thereafter he did not tamper with the valve, nor to his knowledge was it changed. Plaintiffs then constructed a new wing to the dwelling, 16

feet by 60 feet, along the entire west side, placing a utility room as a part thereof to the west of the kitchen, the north wall being about 16 feet long. As a result, the riser was then slightly inside the line of the wall of the utility room about 6 or 8 inches and about a foot from the wall of the kitchen and slightly below the top of the foundation. The foundation system for the new construction was the same as the old, with concrete blocks or bricks as footings, and uprights on that and joists overhead. It was not established as to the direction the joists ran. As a result, there was, except for the uprights, a clear space under both the old and new portions of the house, varying from about 6 inches to 2 feet. The old house had siding extending from the joists to the ground. When the new addition was constructed, the old siding adjoining the new construction was removed so that air could circulate freely under the house. In addition, there were ventilators, one of which was open. The entire house as reconstructed was boarded up on the outside except that there was an open space near the riser, through which air could go to the outside. As stated before, a foot away was the kitchen where it subjoined with the utility room. The entire northwest corner of the kitchen contained wall cabinets on both the side next to the utility room and along the north wall about one-third of the length of the room. Then continuing along the north wall and next to the cabinet was a kitchen range. There was also a refrigerator in the northwest corner. Both the range and the refrigerator were served with electricity. There was no contention that the wiring was defective. The lights were still working after the fire started. In the southeast corner of the room was a hot water heater tank and sawdust burner with a hopper on it about 25 feet diagonally

from the gas pipe. The burner was bricklined and, from the diagram, had a door and a draft opening toward the north wall of the kitchen at a point about one-third or less from the west wall of the room. The sawdust hopper was filled and the burner going before the family went to bed and would ordinarily continue to burn past the time when the fire occurred.

There was ample evidence that odoriferous gas was escaping from a point around the riser and had been from about 1950 when plaintiffs started construction of the house and before the meter was removed and continued up to the time of the fire, although a former owner who was defendant's witness did not detect it. Both the plaintiffs, as well as others, smelled the escaping gas. No one, however, stated positively that the gas could be smelled inside the house. It further appeared that the gas came from below the ground, and when the ground was saturated with water it would "bubble" up in an area 3 or 4 feet in circumference around the riser and that it would burn. There was evidence that plaintiffs had several times notified the gas company to turn off the gas, which was not done, but contrary to plaintiffs' contention there is no evidence in the record that plaintiffs ever actually told defendant that gas was escaping. It further appeared that this particular gas was lighter than air, and, hence, would rise until it came into contact with something that stopped it. In connection with this it appears that gas, when trapped between floor joists, will follow the joists until it reaches an "opening" through the floor which will permit it to rise. It was further elicited that gas at ordinary pressures will not ignite from an ember such as on a burning cigarette, but only from an arc or flame and that if it does ignite, an explosion in a room will not result unless

the gas is confined and reaches a concentration of at least 5%. It also appeared that if gas should escape and then reach a concentration of 5% and at that point become ignited, the flame thus produced would propagate back to the source of supply, that is, "flash back," sometimes resulting in an explosion, and, in any event, there would be a searing effect over the whole area where the gas was confined. Further, it appeared that if gas should follow the floor joists and then ignite, there could be a "flash back," and the gas would be ignited over the whole area. There was evidence that if gas escaped in sufficient quantities and became ignited, it would have materially contributed to the fire.

There was some testimony in behalf of defendant that a fire heating the riser would destroy the oil in the valve portion and might cause it to leak. It further appeared from defendant's testimony that the fact that after the fire the valve did not appear to be turned exactly horizontally to the pipe would not necessarily determine whether the valve was closed, since it was the closing of the slot inside the valve which determined that. After the fire it did appear that the outside handle of the valve was not in a true horizontal position.

The fire started at a time shortly after midnight when all members of plaintiffs' family were in bed. Mr. Ehler testified that there was "a kind of rumble or vibration—more or less maybe like if a jet flew over your home but—No, it wasn't just like that, but a rumble." Mrs. Ehler testified she smelled smoke but heard no explosion. The husband went to the door of the kitchen, opened it and looked in and had "one fleeting glance of the fire rolling back from what was cabinets" along the north wall. The cabinets were "laying

.

out" or "all open" and the wall was "already down," with the exception of a "jagged edge." He identified that portion of the wall that was down as the portion where the cabinets were located. The west wall of the utility room was still intact as well as the south wall of the kitchen, although immediately thereafter flames were observed coming through the cracks between the door and the door jamb of the south wall. Plaintiffs immediately, with difficulty and very rapidly, assisted their children, including a small baby, from the building. Then as Mr. Ehler went outside by the north wall of the house he observed that the fire had progressed so as to ignite the north wall of one-third of the utility room and two-thirds of the kitchen. The cabinets and the sink, also located there, were burned down, and the electric stove and refrigerator had toppled into the yard. He further testified that the greatest volume of flames and most intense heat were in the northwest corner of what had been the west wall of the old house directly over the gas riser. The fire had not then spread beyond the kitchen and utility room. At that point the other walls of the kitchen had not started to burn except near the top. There was ample evidence that the most intense flame was in the area of the portions of the north wall of the house near the northwest corner of the kitchen and the northwest corner of the utility room. There was testimony that "the fire hung there" and that afterward as the fire somewhat subsided flame was observed rising two or three feet above the riser, there being some testimony that it came from the ground and rose from the top of the riser. After the house burned the gas was turned off at the street and the flame ceased. Neither of the plaintiffs claimed to know the cause of ignition of the gas. Firemen were called, but the fire progressed so

rapidly and was so intense they were unable to cope with it.

Having viewed the evidence in the light most favorable to plaintiffs, we must now determine whether or not there is substantial evidence to support a verdict. Mere speculation is not enough. See *Horn v. National Hospital Association,* 169 Or 654, 678, 131 P2d 455, and cases there cited. In an action based upon negligence it must not only be proved that it was possible that the harm was caused by negligence, but that it was reasonably probable that it did so beyond the point of speculation, surmise or conjecture. See *Parker v. Pettit,* 171 Or 481, 489-490, 138 P2d 592; *Wintersteen v. Semler,* 197 Or 601, 636, 250 P2d 420, 255 P2d 138. Plaintiffs in meeting this burden rely in part on circumstantial evidence. Both negligence and proximate cause may be so proved. *Gynther v. Brown & McCabe,* 67 Or 310, 319, 134 P 1186; *Cowgill, Adm'r v. Boock, Adm'r,* 189 Or 282, 291, 218 P2d 445, 19 ALR2d 405. However, the rule permitting proof of negligence and proximate cause by circumstantial evidence is subject to certain limitations.

Where one relies upon circumstantial evidence from which reasonable deductions may be drawn to establish a fact by inference, the inference "must also be sufficiently persuasive to negative all rival conclusions suggested by itself and which show nonliability in the opponent. For instance, if at the close of the presentation of the proof the circumstantial evidence is capable of supporting with equal reason two or more conclusions, one or more of which prove the nonliability of the opponent, the proponent has failed to discharge the burden of proof * * *." *Sullivan v. Mount. States Power Co.,* 139 Or 282, 294, 9 P2d 1038. See also *Annereau v. Ewauna Box Co.,* 176 Or 509, 517, 159

P2d 215; *Topco, Inc. v. 1st Natl Bank of Portland*, 202 Or 32, 51, 273 P2d 420.

■ It has been previously decided that when there are two possible deductions, the burden is met if the proponent presents evidence showing "that the favorable inference is the most logical." *Dunning v. Northwestern Electric Co.*, 186 Or 379, 432, 199 P2d 648, 206 P2d 1177.

In the recent case of *Eitel v. Times, Inc.* (May 11, 1960), 221 Or 585, 352 P2d 485, in determining whether or not there is sufficient evidence to be submitted to a jury, the principles to be followed as announced by other authorities are as follows:

"* * * In 2 Harper & James, The Law of Torts, § 19.4, p. 1068, it is stated:

" 'The test is often expressed in this way: where from the facts most favorable to the plaintiff the nonexistence of the fact to be inferred is just as probable as its existence (or more probable than its existence), the conclusion that it exists is a matter of speculation, surmise, and conjecture, and a jury will not be permitted to draw it. "[W]here the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct the jury that there is no sufficient proof." ' "

Prosser on Torts (2d ed), § 42, p 200 expresses the same idea as follows:

" '* * * What is required is evidence from which reasonable men may conclude that, upon the whole, it is more likely that there was negligence than that there was not. Where the conclusion is a matter of mere speculation or conjecture, or where the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct

the jury that the burden of proof has not been sustained.' "

The rules relating to determination of proximate cause are practically the same as stated in *Eitel v. Times, Inc.,* supra. They are:

"* * * Plaintiff's burden in establishing the causal connection is stated in Prosser on Torts, p 222 as follows:

" "* * * He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, if the probabilities are evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'

Essentially the same test is stated in *Simpson v. Hillman,* 163 Or 357, 364, 97 P2d 257 (1940), in the following language:

" 'It is well established that the causal connection between defendant's act or omission and the injury must not be left to surmise or conjecture. The evidence must be something more substantial than merely indicating a possibility that the alleged negligence of the defendant was the proximate cause of the injury. When the evidence shows two or more equally probable causes of injury, for not all of which the defendant is responsible, no action for negligence can be maintained. In other words negligence can not be based on conjecture or speculation. It must be fairly and reasonably inferable from the evidence * * *.' "

See also 1 Wigmore on Evidence 439, § 41.

■ Applying these principles to the facts in the instant case, we must decide whether there is sufficient

evidence to justify the court in submitting the cause to the jury on any of the grounds of negligence charged in the complaint. It would seem that proof that the pipe was installed by defendant and that gas was leaking therefrom under the ground would be sufficient to justify the trial court in submitting the issue of defective installation, provided, of course, that plaintiffs fulfilled their burden of proof with relation to proximate cause and damage. The question of notice to the defendant of defective installation would not be involved with relation to that specification of negligence since it is without question that defendant did the work. Because there is unquestioned evidence of damage, the main issue in this case is that of proximate cause. Since the evidence as to that is largely circumstantial, what then were the possibilities? Defendant, in effect, says the proof of causation falls at the threshold since even assuming that the gas escaped through the negligence of the defendant and became ignited, plaintiffs have failed to connect its negligence as a proximate cause. There was sufficient evidence to indicate that if gas escaped in sufficient quantity and was ignited, it could have materially contributed to the fire and resultant damage. This exact point was considered in *McClure v. Hoopeston Gas & Electric Co.*, 303 Ill 89, 135 NE 43, 47, 48. In that case, as in this, it was alleged that the gas became ignited, but it was not alleged as to how it became ignited. The court held that in the absence of contributory negligence, recovery was not thereby prevented, stating as follows:

"Whether the defendant was responsible for the ignition or not is immaterial in this case, since the ignition was not an intervening independent cause, but both it and the gas were present and directly contributing causes of the explosion. If

the gas was present because of the negligence of the defendant as alleged in the declaration, he is responsible for all the direct consequences of its presence that could reasonably have been anticipated. It cannot be said, as a matter of law, that ignition and explosion from some condition or cause would not naturally, probably and directly follow the escape of gas in a storeroom." (P 47)

We adopt this reasoning as applicable to the facts of this case.

In the McClure case, at page 49, the appellate court made these observations:

"* * * Generally the burden of proof is held to be on the plaintiff to establish the negligence of a gas company, but such proof may be either by direct or circumstantial evidence, and generally it is held that this is a question of fact for the jury in a case where the question is, What caused the fire? 11 R.C.L. 995, and cases there cited. The origin of a fire has generally been held sufficiently established by inferences drawn from slight circumstantial evidence. Pure Oil Co. v. Chicago, Milwaukee & St. Paul Railway Co., 56 Mont. 266, 185 Pac. 150, and authorities there cited."

In *Skelly Oil Co. v. Holloway* (USCA, 8 Cir), 171 F2d 670, 679-680, it was held that where gas became ignited from fire in the house or from some unknown defect in electrical equipment therein, defendant's negligence in permitting gas to escape was nevertheless a proximate cause in the absence of allegation and proof of contributory negligence. See also *Hashman v. Wyandotte Gas Co.*, 83 Kan 328, 111 P 468; *Lindroth v. Walgreen Co.*, 407 Ill 121, 94 NE2d 847; *Sternboch v. Consolidated Gas Utilities Corp.*, 151 Kan 81, 98 P2d 162. See also the following case where it was held that the evidence was too speculative. *Stenger*

*v. Hope Natural Gas Co.*, 139 W Va 549, 80 SE2d 889.

■ And so in this case the real inquiry is whether escaping gas at some point was in sufficient quantity to be ignitable, that it was ignited, and that it was a proximate cause of the damage. Defendant says that since gas is lighter than air and would rise, necessarily it must have gone outside the house since there was an opening near the riser. That does not necessarily follow because it is more reasonable to assume that the gas went up between the joists since it would first be met with a joist before it could go outside. But defendant says we do not know which direction the joists ran. Since gas will diffuse through small cracks and crevices, it does not follow that the gas would run along any particular joist. In any event, it would go through any crevice or crack that went upward. If, according to the evidence, there was more than 5% concentration at any point and it met with an arc or flame, it would explode or might under some circumstances "flash back." That there was a flame in the sawdust burner is uncontradicted. There was evidence that Mr. Ehler was awakened by a rumble or vibration; that the whole kitchen was aflame and the most intense fire was over the riser. There was no evidence that any of the wiring or appliances were defective. The progression of the fire indicates that it started principally in the northwest corner of the kitchen near the riser, since when the fire was first observed the only portions of the walls that were burned through were on each side of the riser on the northeast part of the utility room and the northwest part of the kitchen. There was no "shorting" observed in the lighting system. It is argued that sawdust burners often explode and this could have been the cause of the fire. However, the sawdust burner was

about 25 feet away from the northwest corner of the kitchen where the fire was most intense. Further, had the burner exploded, it would have been more likely to dispense fire straight across the room toward the north wall, the direction in which its door and drafts were pointed, and yet that portion of the wall in the kitchen had not yet burned through. Further, the south wall of the kitchen was close to the burner and the flames were only beginning to come through the cracks in the door in this wall when the Ehlers first observed the other conditions. And finally, there is the evidence of a flame two or three feet high on the riser as the fire subsided, although that evidence is weakened by the fact that the riser had at that time gone through intense heat. The mere fact that gas was leaking after the fire is not of itself evidence that the leak was also occurring prior to the conflagration. *Mischnick v. Iowa-Nebraska Light & Power Co.*, 125 Neb 598, 251 NW 258, 260; *Kelly v. Portsmouth Gas Co.* (Ohio), 101 NE2d 392, 393. Further, there is evidence of the sudden onslaught of the flames and their sudden progress. Under the circumstances there was such a strong probability that plaintiffs' version of this holocaust is correct that we feel that the other possibilities have been excluded, at least to the point that we cannot say that a jury of reasonable persons would have decided the other way.

Even so, defendant says plaintiffs may not recover since it was incumbent on them to prove by substantial evidence that notice was given to defendant that there was a gas leakage on plaintiffs' premises or that it should have known this without a notice, citing various authorities. But in this case plaintiffs alleged and proved that defendant installed the pipe and valve and capped the same. Further evidence was adduced

from which the jury could have inferred that gas was escaping at the time of capping. When service pipes are improperly installed by the gas company, its liability would not depend upon notice of defective conditions, but it was bound to anticipate injury. *Applegate v. Portland G. & C. Co.,* 142 Or 66, 70, 18 P2d 211, 26 ALR2d 136, 180, 181; 28 Am Jur 685, Gas Companies § 29, notes 3 and 4. We hold, therefore, that with reference to the specifications of negligence having to do with defective installation, it was unnecessary to allege and prove subsequent notice to the defendant.

In view of the conclusion as above stated, we hold that the trial court erred in granting judgment n.o.v.

■ We now turn to plaintiffs' assignment of error having to do with the allowance by the trial court of a motion for new trial. Upon the return of a verdict for the plaintiffs the defendant filed a motion entitled "Motion for Judgment Notwithstanding and, in the Alternative for a New Trial." In the body of this instrument, after stating the motion for judgment n.o.v. and the reasons therefor, the defendant "in the alternative" moved the court for an order setting aside the judgment in favor of the plaintiffs and asking that a new trial be had for various grounds that may be summarized as lack of substantial evidence, error in the giving of an instruction relating to the claimed failure of plaintiffs to prove the cause of the ignition of the gas, failure to instruct with regard to the specification of negligence based upon the failure of defendant to maintain its gas line after notice of escaping gas and the effect of defendant's evidence in that regard, failure to instruct that unless the flame at the riser was a "major factor" in causing the destruction of the house and contents by fire the jury must find for defendant. We have already discussed the questions of

lack of substantial evidence and of notice as to defective installation and the cause of ignition. The court instructed that the cause of ignition was immaterial if defendant's negligence was the proximate cause of the fire, and we concur. Further, the test of "major factor" as applied to proximate cause was unduly restrictive.

We have already pointed out that there was no actual notice to the defendant of the escape of gas although the gas company was notified to turn off the gas.

This does not mean, however, that we can say as a matter of law that the defendant did not receive notice. Notice of acts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is equivalent in the eyes of the law to knowledge of all the facts a reasonably diligent inquiry would disclose. *Heitkemper v. Schmeer et al.*, 130 Or 644, 659, 275 P 55, 281 P 169; *Cameron v. Edgemont Investment Co.*, 136 Or 385, 299 P 698. It appears that defendant at the time of reconstruction of the house had at plaintiffs' request removed the meter and capped the riser, and, hence, insofar as defendant then knew, the gas was already turned off at a point inside plaintiffs' premises. Under such circumstances, upon receiving notice to turn off the gas not only once but several times a prudent person, considering the dangerous nature of gas, might have been put on inquiry as to the cause of the demand. It is reasonably probable that a diligent inquiry would have revealed the cause. Under such circumstances, whether or not defendant received notice of the escape of gas was a matter for the determination of the jury, there being sufficient evidence of the failure of defendant to maintain its gas line.

When an appeal is taken from an order setting aside a judgment and granting a new trial the appellant is obligated to demonstrate on the appeal that no error was committed by the trial court in respect to any of the grounds relied upon in the motion for new trial. *Robertson v. Coca Cola Bottling Co.*, 195 Or 668, 671, 672, 247 P2d 217, and cases there cited. While it is not argued in the briefs, the remaining ground assigned in the motion for new trial was the failure of the court to give defendant's requested instruction set forth under specification III thereof. The trial court properly refused this instruction since it commented on the weight of the evidence. We hold the motion for new trial was not allowable on any of the grounds stated therein. It becomes, therefore, unnecessary to discuss plaintiffs' remaining grounds as to defects in the motion or the order allowing it. Neither the motion for judgment n.o.v. nor the motion for new trial should have been allowed, and the trial court, therefore, is reversed and the cause is remanded with instructions to reinstate the verdict and the judgment thereon in favor of the plaintiffs.

## ON REHEARING

ON RESPONDENT'S PETITION FOR REHEARING

Smith, Gray, Hill & Rodgers, Portland, for the petition.

Before McALLISTER, Chief Justice, and WARNER, SLOAN, O'CONNELL and MILLARD, Justices.

MILLARD, J. (Pro Tempore)

In defendant's petition for rehearing our attention is directed to statements contained in our former opinion wherein it was inadvertently stated that the refrigerator was located in the northwest corner of the kitchen and that gas was escaping in an area 3 or 4 feet in circumference around a riser. In fact, the refrigerator was located in the northeast corner of the

kitchen and gas was escaping in an area 3 or 4 inches in circumference about the riser, and, hence, our former opinion is corrected to that extent. Since we had the facts in mind as they actually existed, this does not in any way change our opinion.

In our opinion we also stated that proof that the pipe was installed by defendant and that gas was leaking therefrom would be sufficient to justify the trial court in submitting the issue of defective installation. We did not mean to indicate that the doctrine of res ipsa loquitur was thereby involved. It was merely a circumstance to be considered by the jury in considering whether the pipe was defectively installed.

Some complaint is made that in the opinion it was stated that defendant was notified several times to shut off the gas. Mrs. Ehler testified that she so notified the company. While Mr. Ehler did not directly testify that he ordered the gas turned off, he stated that when he discovered the condition he called the defendant not only once but several times "not less than once a month" and "for a period of about a year and a half," and that nothing was done.

We see no reason to depart from our former opinion, and the petition for rehearing is denied.