[No. 21898.   *En Banc.*   June 12, 1930.]

G. M. KOHLER, *Appellant*, v. FIRST NATIONAL BANK OF TONASKET, *Respondent*.[1]

*Wilson C. Gresham,* for appellant.

*Patterson & Davis,* for respondent.

FRENCH, J.—The Epso Products Company, a corporation, was engaged generally in the canning business, operating in the vicinity of Tonasket, Washington. Prior to October 8, 1925, the company, through its proper officers, made arrangements to purchase from the appellant a certain piece of machinery known as a filter. This was to be what is generally known to the trade as a cash transaction, and on October 8, 1925, the Epso Products Company purchased and caused to be sent to G. M. Kohler a draft on the Dex-

[1]Reported in 289 Pac. 47.

ter Horton National Bank of Seattle, in words and figures as follows:

"THE FIRST NATIONAL BANK OF TONASKET    No. 14378
                                Tonasket, Wash., Oct. 8, 1925
"Pay to order of G. F. Kohler, $1,000 $1,000 and 00/cts. Dollars.
"To Dexter Horton National Bank,
    "Seattle, Wash.        E. Workosky, Cashier."

There was some little delay on the part of the appellant in shipping the filter, due to the fact, as he claims, that the draft was not promptly received. A considerable number of letters and telegrams passed back and forth between the appellant and respondent before the draft was finally located by appellant, some six weeks after it was dated. It seems to be admitted that the draft had been promptly mailed, and we think the fair inference from the testimony indicates that the delay in receiving the draft probably arose by reason of the fact that the letter was mislaid in one of appellant's offices, and was not located until the 23d of November. On the 22d of November, 1925, the First National Bank of Tonasket sent the following telegram to appellant:

"Tonasket, Wash. Nov. 22, 1925.
"G. F. Kohler, No. 2420 E. 54th St., Los Angeles, Cal.
"You can keep your filter now. Epso stopped payment on draft, having made other arrangements for filter after you lost draft and refused to make shipment.                     FIRST NATIONAL BANK."

Appellant denies receiving this telegram, and there is no testimony in the record purporting to show delivery.

On November 30, the Epso Products Company sent to appellant the following telegram:

"1925, Nov. 30 AM. 10, 32.
"EAA72 19 9 extra

"Seattle, Wash., 30 956A

"Geo. M. Kohler, 1013 E 8 St. or 5420 E St. Los Angeles, Calif.

. "Advise when you are shipping filter omit motor and centrifugal.                    Epso Products Co."

On November 30, the filter in question was, by the appellant, delivered to a common carrier. Within a day or two thereafter, appellant learned that the draft in question had been dishonored when presented for payment to the bank on which it was drawn. He immediately notified respondent of that fact, demanded immediate payment of the face of the draft, together with the costs and expenses in connection therewith, which demand being refused, this action was commenced to recover the amount of the draft, plus protest fees and interest.

Respondent's defense is that, on or about November 12, the Epso Products Company, because of the fact that appellant had failed to promptly ship the filter, notified respondent to stop payment of the draft, which it then did, and it is claimed that the bank then immediately transferred the amount of the draft to the checking account of the Epso Products Company.

The trial court found for respondent bank, and this appeal follows.

The record in this case clearly shows that it was the intention of all the parties hereto that the sale, as made by appellant to the Epso Products Company, should be a cash transaction. Appellant refused to sell the filter in question on credit, refused to do anything in connection with shipping the same until he had received the draft, and it seems to us that the facts of this case are such as to cause its determination to rest entirely on the interpretation of our negotiable instruments act.

Respondent bank issued its bill of exchange in the

sum of one thousand dollars, and was paid therefor by the Epso Products Company. The Epso Products Company thereby became the owner of the instrument. Under the terms of our negotiable instruments act, the undertaking of the bank was as stated in Rem. Comp. Stat., § 3452, which reads as follows:

"Drawer's undertaking—Estoppel. The drawer by drawing the instrument admits the existence of the payee and his then capacity to indorse; and engages that on due presentment the instrument will be accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it. But the drawer may insert in the instrument an express stipulation negativing or limiting his own liability to the holder."

The court has stated the relationship between the payee and the drawer of a bank draft, in *Spiroplos v. Scandinavian-American Bank,* 116 Wash. 491, 199 Pac. 997, 16 A. L. R. 181, where we said:

"The bank, by drawing and delivering the draft, thereby agreed that, if it be duly presented, it would be accepted and paid by the drawee, and in case of default, if notified of the dishonor, would pay it. The drawee entered into no contract relations until the draft had been accepted by it. Up to that time the payee looked exclusively to the drawer for his protection. In *Grammel v. Carmer,* 55 Mich. 201, 21 N. W. 418, in the opinion written by the late Judge Cooley, it was said:

" 'The drawer, by drawing and delivering the paper to the payee, agrees that if duly presented it shall be accepted and paid by the drawee, and that in default thereof he will, if duly notified of the dishonor, pay it himself. The drawee enters into no contract relations with the payee in respect to it until it is presented to him, nor then unless he does so by acceptance. If he accepts, he undertakes to pay according to the terms of the bill or of the acceptance; but up to the time of

that act the payee looks exclusively to the drawer for his protection. . . .''

In this connection, it must be remembered that the Epso Products Company is not a party to this suit. If there was any unreasonable delay in shipment, the Epso Products Company were the only ones who could complain, and, by their telegram of November 30, insisting upon immediate shipment, the company has not only waived such defense, but has affirmatively ratified the shipment at the later date. This action is brought by the appellant to recover on a bill of exchange drawn by the respondent bank, and the question involved is, Under circumstances such as we have outlined, can a bank refuse to honor the draft which it has issued?

This is but one of a species of commercial paper, the common forms of which are bank drafts, cashiers' checks, and certified checks. This instrument is not altogether a draft, as that word is ordinarily understood in commercial usage. It is in reality a check drawn by one bank upon another, and is generally known as a bank draft as distinguished from ordinary drafts, and in commercial usage is drawn by a bank only on its correspondent bank where a deposit is maintained. The transaction is very like an ordinary individual drawing a check against his own bank account and selling the check for value to a third person. It partakes of the nature of a cashier's check. Speaking of a bank draft drawn as this one, Brannan's Negotiable Instrument Law (4th ed.), p. 571, states: A draft executed as this one is in reality a cashier's check. And, as holding that a draft such as this is a cashier's check, see *People v. Miller,* 278 Ill. 490, 116 N. E. 131, L. R. A. 1917E, 797; *Ridgely National Bank v. Patton & Hamilton,* 109 Ill. 479; 1

Daniel, Negotiable Instruments, § 424; 2 Daniel, Negotiable Instruments, § 1566.

The true cashier's check, on the other hand, is a bill of exchange drawn by the bank upon itself, and accepted by the act of issuance. *Montana-Wyoming Ass'n of Credit Men v. Commercial National Bank,* 80 Mont. 174, 259 Pac. 1060; *Anderson v. Bank of Tupelo,* 135 Miss. 351, 100 South. 179; *Walker v. Sellers,* 201 Ala. 189, 77 South. 715; Uniform Laws, Ann., Vol. 5 (Negotiable Instruments Act), p. 694.

The authorities examined hold that cashiers' checks, certified checks, and bank drafts are the same class of commercial paper, and are governed by the same rules, and this is easily understandable when such instruments are studied and their true nature determined. As so holding, see note 56 A. L. R. at p. 532.

A certified check is but an ordinary bill of exchange of an individual or corporation, and the liability of the bank on which it is drawn becomes absolute by certification, or, in other words, by an unqualified acceptance. A true cashier's check is but a bill of exchange drawn by a bank upon itself, and accepted by its being issued. A bank draft is a bill of exchange drawn by a bank upon its correspondent bank, and usually, as in this case, issued at the solicitation of a stranger who purchases and pays therefor, and the liability of the bank which executes the instrument is fixed by its issuance, while the liability of the bank on which it is drawn is fixed and determined by its acceptance.

The cases above cited all hold that payment cannot be stopped on a cashier's check, as do many others which we have examined. Our own court has discussed the question of cashier's checks, and held that payment cannot be stopped. *Scott v. Seaboard Securities Co.,* 143 Wash. 514, 255 Pac. 660. The liability

of a bank issuing a draft, from its very nature, must be practically that of a bank issuing a cashier's check. The only difference between the two instruments is that a true cashier's check is accepted by its issuance. The liability of the bank as drawer is indentical in both cases. No case has been cited which indicates that payment may be stopped on cashiers' checks, certified checks, or bank drafts, and the textwriters generally hold that it cannot be done. Brady on Bank Checks (2d ed.), p. 263; 5 R. C. L., p. 528, § 48.

██ There is still another reason why respondent bank cannot refuse payment.

This bank draft was purchased by the Epso Products Company. When it purchased and paid for this instrument and caused it to be sent to appellant, appellant became a holder in due course, and for value, as the same is defined by Rem. Comp. Stat., § 3443, the same being § 52 of our negotiable instruments act.

When a draft, cashier's check or certified check is obtained at a bank, it is often payable to a party other than the one who obtains it. At the time a cashier's check or bank draft is secured at a bank, it is owned by the one who buys it. In the instant case, the draft in question was owned by the Epso Products Company and it was negotiated by delivery.

There are two lines of decisions on the question of whether or not the payee in a negotiable instrument can be a holder in due course under the negotiable instruments act. As representative of the cases holding that the payee can not be a holder in due course, see *Builders Lime & Cement Co. v. Weimer,* 170 Iowa 444, 151 N. W. 100; *First National Bank of Herrington v. Lyons Exchange Bank,* 100 Kan. 194, 164 Pac. 137; *Southern National Life Realty Corp. v. People's Bank,* 178 Ky. 80, 198 S. W. 902; *St. Charles Savings Bank v. Edwards,* 243 Mo. 553, 147 S. W. 978;

*Independent Harvester Co. v. Anderson,* 45 S. D. 60, 186 Pac. 112.

The theory of most of these cases seems to be that the negotiable instrument is issued to a payee and not negotiated to him, but in none of them are facts applicable to this case. In line with these cases, is the case of *Bowles Co. v. Clark,* 59 Wash. 336, 109 Pac. 812, 31 L. R. A. (N. S.) 613, wherein, however, there is no discussion of the negotiable instruments act as applied to whether or not the party is a holder in due course, and no citation of authority.

In *Vander Ploeg v. Van Zuuk,* 135 Iowa 350, 112 N. W. 807, 124 Am. St. 275, 13 L. R. A. (N. S.) 490, one of the leading cases, the court states that it does not mean to lay down the rule, however, that in no case can a payee be a holder in due course. On the other hand, we think, the greater weight of authority, and the better reasoned cases, support the rule that the negotiable instruments act, in so far as it is applicable to holders in due course, confirms the rule of the common law, and that the negotiable instruments act can not be held to have abrogated the common law rule unless it expressly so states. All of the cases concede that, under certain circumstances, the payee can, at common law, be a holder in due course. None of the cases examined hold that, under circumstances such as exist in the instant case, where the draft had been issued at the request of the purchaser and for a valuable consideration, and thereafter transferred to the payee as in this case, for a valuable consideration, the payee is not a holder in due course.

As opposed to the authority which we have heretofore cited, the following excerpts from Massachusetts are illustrative of the extent to which courts have gone:

"Although the defendants are the payees of the checks, they did not receive them from the plaintiff or Walker, its treasurer. The checks came to the defendant from Wilson, to whom, presumably, they were delivered as completed instruments, and they came to the defendants without notice of any infirmity. The payee of a check under such circumstances is a holder in due course. *Liberty Trust Co. v. Tilton,* 217 Mass. 462; *Boston Steel & Iron Co. v. Steuer,* 183 Mass. 140. See, also, *Fillebrown v. Hayward,* 190 Mass. 472." *National Investment & Security Co. v. Corey,* 222 Mass. 453, 111 N. E. 357.

"The plaintiff is not entitled to recover under these circumstances. The defendant bank, although named as payee of the check, was or might be, nevertheless, a holder in due course. *Liberty Trust Co. v. Tilton,* 217 Mass. 462, and cases there collected. . . . The defendant became a holder in due course by receiving a check complete and regular on its face, before being overdue, in good faith and for value, with no notice of any infirmity in the check or defect in the title of the person negotiating it." *Colonial Fur Ranching Co. v. First National Bank,* 227 Mass. 12, 116 N. E. 731.

"A check payable to the plaintiff is handed by the drawer to her husband, to be delivered by him to the plaintiff in payment of a debt to become due from the drawer of the check to the payee, and is fraudulently handed by the husband to the payee of the check in payment of a debt due from him to the payee, and is accepted by the payee in good faith in payment of that debt. In such a case the payee of the check is a *bona fide* purchaser of the check for value, without notice, and the drawer could not set up the husband's fraud in defense of the check, nor maintain an action for money had and received after payment of it on discovering the fraud.

"The fact that the plaintiff is the payee of a negotiable security does not prevent him from becoming a *bona fide* purchaser of it at common law, with all the rights incident to a purchaser for value therefor without notice. That was decided in *Watson v. Russell,* 3

B. & S. 34, and affirmed in Exchequer Chamber in the same case. 5 B. & S. 968. To the same effect are *Poirier v. Morris,* 2 El. & Bl. 89; *Nelson v. Cowing,* 6 Hill. 336, 339; *Monroe v. Bordier,* 8 C. B. 862, and *Armstrong v. American Exchange Bank,* 133 U. S. 433. The case of *Fairbanks v. Snow,* 145 Mass. 153, might have been decided on this ground but was disposed of on common law principles. . . .

"The checks in question in the case at bar were given after the negotiable instrument act (Stat. 1898, c. 533; Rev. Laws, c. 73) went into effect, and are governed by its provisions. The plaintiff is a holder in due course of the two hundred dollar check within Revised Laws, chapter 73, § 69. This section is taken from § 29 of the English bills of exchange act of 1882, and *Watson v. Russell,* is cited in Chalmers, Bills of Exchange, (5th ed.) 89, as an example of a person who is a holder in due course within that section." *Boston Steel & Iron Co. v. Steuer,* 183 Mass. 140, 66 N. E. 646, 97 Am. St. 426.

As holding that the payee named may be a holder in due course, see *Johnston v. Knipe,* 260 Pa. St. 504, 105 Atl. 705; L. R. A. 1918E 1042; *Ex parte Goldberg & Lewis,* 191 Ala. 356, 67 South. 839, L. R. A. 1915F, 1157; *Redfield v. Wells,* 31 Idaho 415, 173 Pac. 640; *Merchants' National Bank v. Smith,* 59 Mont. 280, 196 Pac. 523, 15 A. L. R. 430; *Bank of Commerce & Savings v. Randell,* 107 Neb. 332, 186 N. W. 70, 21 A. L. R. 1360; *Bergstrom v. Ritz-Carlton Restaurant & Hotel Co.,* 171 App. Div. 776, 157 N. Y. Supp. 959; *Brown v. Brown,* 91 Misc. Rep. 220, 154 N. Y. Supp. 1098.

If the contention of the respondent be sustained, it would unsettle the basic principles of our entire law of commercial paper. Literally millions of dollars worth of business is transacted in the United States every day by means of bank drafts, certified checks and cashiers' checks. They are uniformly, by business houses, placed in the same category, the credit in each case being extended, not to the person delivering them,

but they are accepted on the faith and credit of the bank issuing them. There is no essential difference between a bank note issued by a national bank and its certified check, cashier's check, or draft, other than the fact that the bank note is backed not only by the promise of the bank, but this promise is secured.

All this kind of paper is the bank's *unconditional promise to pay,* and if it be held that payment can be stopped on a bank draft, then it must follow that payment can be stopped on a certified check and a cashier's check, and we have made uncertain commercial paper on the faith of which much of the business of the United States is transacted, contrary, not only to our own decision in the *Scott* case, *supra,* but also contrary to the decision in every case which we have examined. Such a holding would make a bank draft of no greater value than the personal check of the party delivering it, and would nullify certain sections of the negotiable instruments act, particularly Rem. Comp. Stat., § 3452, above quoted.

We hold that, under the circumstances above detailed, appellant is a holder in due course and for value, and, as to such holder, respondent bank has no defense.

Reversed with instructions to enter judgment for appellant.

MITCHELL, C. J., MAIN, PARKER, and MILLARD, JJ., concur.

FULLERTON, J., concurs in the result.

BEALS, J. (dissenting)—In my opinion, the draft drawn by respondent on Dexter Horton National Bank of Seattle was subject to a stop order by respondent, provided respondent cared to assume the risk of directing the drawee bank to refuse payment of the draft. A reading of the record in this case satisfies me that

the draft was promptly delivered in due course of mail at one of appellant's offices in Los Angeles, and that any delay in the calling of the attention of appellant to the fact that the draft was in his office was caused by the carelessness of appellant's employees, for which appellant is chargeable. Considerable delay having elapsed in the shipment of the filter by appellant, Epso Products Company was justified in canceling the order and directing respondent to stop payment on the draft, and respondent had a right to take this action if it cared to assume the risk of the outcome of a probable lawsuit.

I am unable to see the distinction, which appeals to the majority of this court, between a check or draft drawn by one bank upon another bank, and a check drawn upon his own bank by a depositor. In my opinion, such a piece of commercial paper as is here in question is subject to a stop order just as the check of the depositor upon his own bank is subject to stoppage. Cashier's checks and certified checks are different in nature from the draft here in question.

In my opinion, the judgment appealed from should be affirmed.

TOLMAN and HOLCOMB, JJ., concur with BEALS, J.