P. G. WILSON and Mrs. P. G. Wilson, Plaintiffs in Error,

v.

The FIRST NATIONAL BANK AND TRUST COMPANY OF OKLAHOMA CITY, Oklahoma, a corporation, and the Liberty National Bank and Trust Company, a corporation, Defendants in Error.

No. 36225.

Supreme Court of Oklahoma.

Oct. 26, 1954.

Wayne E. Wheeling, Ross N. Lillard, Oklahoma City, for plaintiffs in error.

Monnet, Hayes & Bullis, Oklahoma City, for defendant in error, Liberty Nat. Bank & Trust Co. of Oklahoma City.

Fenton & Fenton, Oklahoma City, for defendant in error, First Nat. Bank & Trust Co. of Oklahoma City.

BLACKBIRD, Justice.

This action involves the relative rights of the litigants to the proceeds of a cashier's check in the amount of $5,000, which one Ted Burkhart, bookkeeper for a business operated by W. H. May, a depositor of the Liberty National Bank & Trust Company, of Oklahoma City, fraudulently procured said bank to issue, on January

9, 1951. It is one of four identical cashier's checks he obtained at the bank at the same time, made payable to the order of: "Martin Towell." They were purchased with an ordinary check in the amount of $20,000, signed by Burkhart's employer, May, wherein the payee was designated by the same name. (It was developed at the trial that said name was fictitious in that it belonged to no known individual and was merely the first part of the name of Martin Towell Supply Company, which had been furnishing towel service to May's establishment, for which said service he owed a much lesser sum, indicated by evidence offered to be only $7.60). It does not clearly appear whether the amount of the check was filled in when Burkhart procured his employer to sign it, or whether Burkhart did that afterwards. It is certain from the undisputed evidence, including May's testimony, however, that he never intended to sign a check to said Towell Supply Company for more than his debt to it. Thereafter, in the course of his duties during the following week, or on January 15, 1951, Burkhart took several thousand dollars of the current receipts of May's business to the Liberty National Bank, and, immediately after depositing said funds to May's account, presented the above described $20,000 check to the teller who usually handled Mr. May's deposits and knew Burkhart to be his bookkeeper, and obtained said teller's "O.K." on it for the purchase of one or more cashier's checks. Thereupon Burkhart delivered the check, thus "O.K.'d", to another teller whose duties consisted at least partly in making out cashier's checks for the bank. At Burkhart's direction, this teller made up four $5,000 cashier's checks, bearing the same fictitious payee's name as May's aforesaid $20,000 personal check which he entered on the bank's cashier's check register. After both he and the assistant cashier had signed these four cashier's checks they were delivered to Burkhart. Sometime after leaving the bank, Burkhart himself wrote the name: "Martin Towell" as an endorsement on the back of the one involved here, and apparently delivered it to one of the owners of an Oklahoma City night club. Later one of these owners delivered the cashier's checks, without further endorsement, to plaintiff in error, P. G. Wilson, a building contractor, to apply on a larger debt said owners owed him for construction work he had performed at their night club. The check was then endorsed by Wilson's wife, the other plaintiff in error, and deposited by her on January 18, 1951, to the Wilsons' joint checking account in the First National Bank & Trust Company of Oklahoma City, hereinafter referred to merely as: "First National." The next day the check cleared through regular banking channels and was paid without protest by the Liberty National Bank & Trust Company, hereinafter referred to merely as: "Liberty National." Thereafter, when the $20,000 check Burkhart had used to purchase the four $5,000 cashier's checks, as aforesaid, was mailed by Liberty National to Mr. May's place of business in the same envelope with his other cancelled checks and bank statement for the same period, Burkhart received it and destroyed it unbeknown to Mr. May. Later, after Burkhart suddenly left May's employment on March 28, 1951, an auditor, employed by May, during a protracted audit of May's books, discovered the shortage in May's bank account and reported it to him. Thereupon, May made an affidavit apparently indicating that the cashier's checks had been forged, and presented it to said bank. Thereupon, one of said Bank's officers notified one of the First National's officers of the apparent forgery and the First National debited the account of plaintiffs' in error in the amount of $5,000, and notified them of the pending controversy concerning the check and informed them that it would hold said sum pending the outcome of such controversy. Thereafter, when First National refused, upon their demand, to return the $5,000 as a credit to their account, plaintiffs in error commenced the present action, as plaintiffs, against First National, as defendant, to recover said sum. Later at the instance of said defendant, Liberty National was ordered to and did appear therein as an additional defendant and/or interpleader.

After the issues were joined and decided by the Court without a jury, judgment was rendered against plaintiffs, decreeing that First National recover the $5,000 from them and that Liberty National recover it from First National.

Mr. and Mrs. Wilson, whose trial court designation of plaintiffs will be continued, have lodged the present appeal. They contend that the trial court erred in denying them recovery of the proceeds of the $5,000 cashier's check because it came to them as holders for value without notice of any defect therein, and, under the rules covering such negotiable instruments, the check had been accepted for payment by the Liberty National as drawee at the same time it issued it as maker and drawer. They say that under such rules such paper has the same attributes as money, which, even if stolen, cannot be recovered by the true owner from such holders for value without notice. They then say that under their theory, it can make no difference that the check may in fact have been made to a fictitious payee, for, under our negotiable instruments law, one who makes, as well as one who accepts, such an instrument admits the existence of the payee and his then capacity to endorse, citing Tit. 48 O.S.1951 §§ 141, 143. They also cite Sections 294, 298, and 404, of said Title, providing that a "general acceptance" of a negotiable instrument assents without qualification to the order of the drawer; that certification of a check by the bank on which it is drawn is the equivalent of acceptance; that a cashier's check is a bill of exchange which, when accepted before it is drawn, is accepted in favor of every person who upon the faith thereof, received it for value; and that by reason thereof, the bank's obligation to pay it becomes absolute. Plaintiffs' first argument that when the cashier's check in question was issued it was the equivalent of "bearer paper" or money, seems to be based principally on the latter sections. They argue that to have kept the check involved from being freely negotiable, the Liberty National would have had to have accepted the check conditionally rather than generally or unconditionally, as it did. The simple gist of their argument seems to be that it could make no difference to said bank whether or not the check was forged, or even stolen, after its issuance; that by unqualifiedly drawing the check upon itself as drawee, it represented to the world that it had $5,000 already set aside and earmarked for the purpose of paying that particular check. We cannot agree with plaintiff's interpretation of such a check and the provisions of our negotiable instruments law applicable thereto. Granting that by the provisions of Sections 141 and 143, the maker and acceptor of such a check "engages that he will pay it according to its tenor", and that in both making and accepting the check, he theoretically admits "the existence of the payee and his then capacity to indorse", such maker and acceptor does not "engage", promise or represent that he will pay the check if some person or party other than the named and intended payee endorses it in his stead or forges the payee's name as his endorsement thereon. The check in question was not accepted *before* it was drawn. It was accepted only *after,* and *as* drawn, payable to the order of the named payee. If the check had been made payable to bearer, then it would have been freely negotiable as money and in the hands of a holder for value without notice it would have made no difference that it had been stolen or negotiated by a person who had no right to it. See 8 Am.Jur., "Bills and Notes", sec. 619, p. 332. As it was made "Pay To The Order Of Martin Towell" it was payable only in that "tenor", and only after said named and intended payee, or some one authorized by the named payee to do so, had endorsed said payee's name thereon. Under our statute a forged signature is wholly inoperative, and no right to enforce a forged instrument can be acquired through such signature. 48 O.S.1951 § 43; Jones v. Citizens' Nat. Bank of Okmulgee, 106 Okl. 162, 233 P. 472. In Young v. Hembree, 181 Okl. 202, 73 P.2d 393, 394, this Court said that in order for a holder of a check payable "to order" to be deemed a "holder in due course", the check must have been endorsed by the payee; and where it has not, said holder cannot be regarded as having taken as an innocent purchaser. Although plaintiffs point out that

the cited cases involved ordinary or personal checks as distinguished from cashier's checks, and they contend that the rules applied to the former should not apply to the latter, which are more negotiable and partake more of the nature of money or "paper current", we have been unable to discover any valid reason for making the drawee bank any more responsible for, or liable *regardless of the genuineness of the payee's endorsement on,* a cashier's check than on an ordinary check. Such checks have neither the purposes or attributes of traveler's checks, such as were involved in American Express Co. v. Anadarko Bank & Trust Co., 179 Okl. 606, 67 P.2d 55, 110 A.L.R. 972, upon which plaintiffs strongly rely. As pointed out in that case traveler's checks are issued in such form and with such representations that they cannot be regarded as *incomplete instruments nor non-negotiable,* as far as the issuing agency is concerned, *even before* any signature of the payee appears thereon. This cannot be said of a cashier's check which is not completely negotiable until it bears the genuine endorsement of the payee.

■ Plaintiffs also cite cases for the rule that where a negotiable instrument is intentionally made payable to a fictitious person, it is treated as payable to bearer after transmission to a bona fide holder for value. The case of Kohler v. First Nat. Bank of Tonasket, 157 Wash. 417, 289 P. 47, is not in point here. That case involved the question of whether payment could be stopped on a bank draft. As to the cashier's check involved herein no one is attempting to stop payment of it according to its "tenor" or as "accepted" by the issuing bank. The objection to payment is that it was not negotiated according to its tenor and the payee to whose order it was made payable, never "gave the order" or (in other words) endorsed it, but that another forged the endorsement which was wholly incapable under Tit. 48 O.S.1951 § 43, supra, of passing to the holder any right to the payment that had been guaranteed by the issuing bank. For the same reason, and others, the authorities cited by plaintiffs to the effect that defenses arising out of the transfer of a bill or note, that are personal to the transferrer, are unavailable to the maker, are not applicable to the check in question. The bank has a right to insist that the check be paid only according to its tenor and, by our negotiable law, that is a statutory and implied condition of every general acceptance. It is only on that condition that Liberty National could be held to have assumed any obligation to pay it under our "holder in due course" statute, 48 O.S.1951 § 129, *prior* to its acquisition by plaintiffs. Nor had the check, when plaintiffs acquired it, ever become payable to bearer as having been endorsed in blank, (as provided in Tit. 48 O.S.1951 § 85) because said purported endorsement of the payee named therein (that would have made it so payable) was *not a genuine* endorsement.

■ Plaintiffs' further argument is substantially the following. Since, according to the testimony of the Liberty National's employees and officials who handled May's personal check and the issuing of the cashier's checks which it purchased, they did not know or consider whether the payee's name "Martin Towell" was fictitious or not, but merely made the cashier's checks payable to the order of the same payee as the one named in the personal check (taking the latter and similar direction from Burkhart as their authorization for so making it) W. H. May, himself, was the real maker of the cashier's checks and said employees merely his agents; and since May's testimony showed that when he signed the personal check, he never entertained any belief that "Martin Towell" was an individual in being and knew that was not the name of his creditor "Martin Towell Supply Company", he therefore knew he was making the check to a fictitious payee, and, though he did not know or intend that cashier's checks totalling $20,000 would be issued on the strength of his personal check, he must be held to know this, since his agent Burkhart knew, and therefore the cashier's checks must in law be termed payable to bearer, citing 7 Am.Jur., "Bills and Notes", sec. 96, and cases cited in the notes thereto. See also 10 C.J.S., Bills and Notes, § 129. A necessary element of this theory is that the knowledge of the agent

Burkhart was imputable to his principal May, and, under it, the bank's employees and officials whose actions were necessary in assisting Burkhart to carry out his fraudulent scheme whereby the cashier's checks were obtained, were also May's agents. This Court in the leading case of Aetna Casualty & Insurance Co. v. Local Bldg. & Loan Ass'n, 162 Okl. 141, 19 P.2d 612, 613, 86 A.L.R. 526, held:

> "The knowledge of agent is not imputed to his principal where the knowledge sought to be imputed concerns, or is connected with, an independent fraudulent act being perpetrated by the agent for his own benefit, unless such agent is the only agent acting for the principal in connection with the transaction both in perpetrating the fraudulent act and in receiving the benefits thereof."

In this connection, see also 3 C.J.S., Agency, § 269, and the discussion in the Annotations at 50 L.R.A. 75. On the basis of the above authority, plaintiffs' theory referred to cannot be applied to the present case.

Plaintiffs' remaining argument is that since the evidence fails to show that Liberty National has reimbursed or restored to Mr. May's account the $5,000 it has already paid the collecting bank, First National (who has remained in possession of the money as a sort of stakeholder awaiting the outcome of this litigation) and, for all that appears, the personal check which purchased the cashier's checks remains charged against May's account in the Liberty National, that bank has failed to prove it has suffered any loss by reason of such payment, which, under some of the authorities referred to in Jones v. Citizens' Nat. Bank of Okmulgee, supra, and others, 9 C.J.S., Banks and Banking, § 357(3), is a necessary prerequisite to its recovery. That rule is not applicable to Liberty National in the present case. It applies where the bank can *lawfully* charge the payment to the account of its depositor. 7 Am.Jur., "Banks", sec. 598, p. 434, Note 10, and the authorities cited thereunder. While it is true that here the Liberty National was not shown to have restored to his credit the $5,000 (or any part of the $20,000) originally debited to Mr. May's account, and as far as the record shows has awaited the outcome of this litigation before doing so, it must be assumed that since it has been established that the money represented thereby has been disbursed on a forged endorsement, said bank will recognize that said sum *cannot remain* debited to May's account and will replace or supersede said debit with a credit. Liberty National cannot be deemed guilty of negligence in paying the cashier's check when forwarded to it for that purpose with First National's and Mrs. Wilson's endorsement thereon. It had no way of ascertaining the genuineness of the endorsement of "Martin Towell" like it would have had in the instance of one of its depositor's signatures. It had a right to rely on these endorsements as guaranteeing the validity of the previous "Martin Towell" endorsement. As already demonstrated, neither First National nor the Wilsons could acquire any right or title to the check's proceeds through that previous forged endorsement. First National does not assert, nor should plaintiffs be heard to base, any right to the money on the fact that Liberty National has not yet reimbursed its depositor May, who is the real owner of the cashier's check and its proceeds by reason of his funds having gone to purchase it. Liberty National can receive said proceeds only as trustee for its said depositor, and we think it is entitled to recover same for him who is not directly a party to the cashier's check and in as good a position to sue thereon as the Bank. In this connection see Security Savings Bank v. First Nat. Bank of Michigan City, 6 Cir., 106 F.2d 542, and the annotations thereto at 127 A.L.R. 122; Farmers' Nat. Bank of Augusta v. Farmers' & T. Bank, 159 Ky. 141, 166 S.W. 986, and the Annotations thereto at L.R.A.1915A, 77, 89, 90 and other cases cited in the Notes at 7 Am.Jur. 434, supra. Plaintiffs' position is rather analogous to that of a plaintiff in a quiet title action. Such a party must prevail on the strength of his own title rather than the weakness of his adversary's. Here, since it has been demonstrated that plaintiffs ac-

quired no right to its proceeds because the check never had a true or genuine endorsement of the payee named therein, the fact that the drawer bank may not, as between it and its depositor, have the ultimate right to such proceeds, in no way strengthens their right or "title" to said money.

The judgment of the trial court is affirmed.

HALLEY, C. J., JOHNSON, V. C. J., and WELCH, CORN and ARNOLD, JJ., concur.