Argued December 5, 1957, reversed and suit dismissed
February 28, 1958

## AMATO *v.* FULLINGTON ET UX
322 P. 2d 309

*D. W. McEwen*, Portland, argued the cause for appellants. On the briefs were Cake, Jaureguy & Hardy, Portland.

*Virgil Colombo* argued the cause for respondent. On the brief were Fertig & Colombo, Portland.

Before LUSK, Presiding Justice, and WARNER and KESTER, Justices.

LUSK, J.

This is a suit to cancel a note and mortgage in which the court entered a decree for the plaintiff, and the defendants have appealed.

The plaintiff, Calogero S. Amato, alleged in his complaint that his signature to the instruments under attack was "procured by fraud and deceit and no consideration of any kind or character ever passed from these defendants to plaintiff." It is not alleged

in what the fraud consisted or who perpetrated it, nor that there may not have been consideration from some other source. Defendants, in their answer, in addition to denying the allegation quoted, plead that they had acquired the note and mortgage for $3600, which they paid in good faith without notice of the alleged fraud or want of consideration, and are holders in due course of the said promissory note.

The note and mortgage are dated November 3, 1954. The note is in the principal sum of $3600, payable in five years to Lee H. Fullington and Tinsie E. Fullington, husband and wife (the defendants), with interest at the rate of seven percent per annum, payable semi-annually, and is secured by a mortgage of even date on real property in the city of Portland. Both instruments are signed Calogero S. Amato.

The plaintiff was the owner of a lot improved with three dwellings in the city of Portland, this being the property described in the mortgage. He testified that in October 1954 two representatives of a corporation known as Napco, Inc., Barasch (referred to by the plaintiff in his testimony as Bush) and Crawford, called on the plaintiff at his home and offered to remodel with siding and roofing the three houses on his real property for $3600, on which he would be allowed a credit of $2500, the balance of $1100 to be paid in five years. They represented that they would use a new material which they were introducing in Portland, that they intended to use this job for advertising purposes, and that they would allow the plaintiff a credit of $50 for each house within a radius of two and one-half miles from the plaintiff's property for which they got similar jobs as a result of such advertising. Amato accepted their offer and signed a paper writing in which he authorized the work and

agreed to pay for it $3600 in five years "on participation plan." The record contains no explanation of the meaning of this phrase. This instrument is dated October 22, 1954, and was signed "C. S. Amato." A few days later Barasch and Crawford returned, told Amato that the home office would not agree to the terms previously offered, and that they could allow a credit of only $1400, leaving a balance of $2200 for the plaintiff to pay. The plaintiff agreed to the modified terms.

Shortly after this Barasch alone returned and told the plaintiff that he wanted him to sign his full name to the contract. He produced a paper with printing on it and blank spaces. The plaintiff protested against signing because the paper was blank, and said that he did not know what Barasch would "put in," but Barasch told him that it was only the contract. Amato's daughter was present and told him that it was all right for him to sign. She testified that she saw the papers, but "just across the table," and that she did not have them in her hand.

The plaintiff yielded to Barasch's request and signed two papers which Barasch told him the company would fill in, one copy to be returned to the plaintiff. A few days later Napco commenced work on the houses.

According to the plaintiff's testimony, he learned for the first time that he had executed a note and mortgage some five weeks later when the defendant, Lee H. Fullington, brought it to his attention under circumstances to be hereinafter stated.

The Fullingtons acquired the note and mortgage in the following manner. Sometime before the Amato transaction Mr. Fullington was advised by M. C. Smith, a realtor doing business as Hall Agency, that if Fullington had cash available he could get for him some

good mortgages. Fullington was in the dry cleaning and laundry business, and, having some money in the bank, he and his wife decided to avail themselves of Smith's offer. After they had purchased two mortgages through Smith which were satisfactory Smith told Fullington that he had another first mortgage for $3600, this being the Amato mortgage. Fullington looked at the property, and, being satisfied with the security, advised Smith that he would take the mortgage. Up to this time he had not seen the mortgage. Smith told him that he would get a title report, and, after being advised by Smith that the title was all right, Fullington delivered to Smith a cashier's check made payable to Hall Agency for $3450, the balance of $150 going to satisfy an indebtedness in that amount (which had arisen out of one of the previous transactions) from Smith to Fullington. Thereafter Fullington received the note and the recorded mortgage and a policy of title insurance. About six weeks later he learned that mechanic's liens had been filed against the property on account of unpaid bills for work which had been done on the houses by Napco, and, being concerned about this, looked up Amato, who, "at first didn't seem to understand that there was a mortgage on the property." It was then that Fullington learned that Amato had not received the money which he had paid to Smith.

Smith, who previously had disposed of mortgages for Napco, testified that, when he first learned of the Amato loan from representatives of the company, they had in their possession a note and mortgage for $3600 payable to Napco signed "C. S. Amato." He called the loan to Fullington's attention, and, after the latter had inspected the property and indicated his desire to purchase the mortgage, Smith ordered a title report,

which, when received, showed that the property stood in the name of "Calogero Amato." He advised the Napco people that he could not accept the mortgage as executed because the mortgagor's name was not signed in full, and he had a new note and mortgage typed in his own office which he told the Napco representatives must be signed in conformity with the name as it appeared on the deed to Amato. The instruments were made out directly to the Fullingtons, as they had already agreed to the purchase. The Napco representatives took these instruments away and brought them back to Smith signed Calogero S. Amato, the mortgage being acknowledged before Barasch as a notary public. Smith testified that he was not in possession of the original Amato mortgage, and it was not produced at the trial. Neither of the defendants had ever seen it. Smith did not know Amato and never talked to him until after Fullington had seen Amato about the liens. Smith's fee for disposing of the mortgage was $170. This he deducted from the amount paid to him by the defendants and disbursed the balance to Napco. The plaintiff received no part of it.

It is contended first by the defendants that the complaint does not state a cause of suit because the allegation of fraud is insufficient, and the allegation of want of consideration is consistent with the receipt of a consideration by the plaintiff from someone else than the defendants. We recognize the force of the objection, but pass it by and will decide the case on the merits.

■ The question presented is whether the defendants are protected as holders in due course of the Amato note under ORS 71.052, which provides:

"A holder in due course is a holder who has

taken the instrument under the following conditions:

"(1) That it is complete and regular upon its face;

"(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"(3) That he took it in good faith and for value;

"(4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

■ The plaintiff, it may be assumed, was induced to sign the note and mortgage by the fraudulent misrepresentation of Barasch, Napco's representative, as to the character of the instruments. The note was complete and regular upon its face when it was delivered by Smith to Fullington. The defendants had no knowledge of the fraud nor any reason to suspect it. They took the note in good faith, in the regular course of business, and gave full value for it. Their position is not affected by any knowledge which Smith may have had, or which could be imputed to him, for he was not their agent but Napco's. *O'Bryan v. Jackson*, 118 Or 514, 518–519, 247 P 318.

■ It is now the firmly-established law of this state that a payee of a negotiable instrument may be a holder in due course. The most recent decision is *United Finance Co. v. Anderson*, 212 Or 443, 319 P2d 571, 576, where the previous cases are cited. The leading case is *American Nat. Bank v. Kerley*, 109 Or 155, 186–193, 220 P 116, 32 ALR 262, where the court, in an opinion by Mr. Justice Harris, announced its approval of what was referred to as the Massachusetts rule and its agreement with the reasoning of Chief Justice Rugg in *Liberty Trust Co. v. Tilton*, 217 Mass 462, 105 NE 605, LRA 1915B 144. The *Kerley* case was an action

by a bank to recover on a promissory note payable to the bank against Kerley, the principal maker, and two accommodation makers. The defendants other than Kerley claimed that they signed the note at the request of Kerley with the understanding that it was not to be delivered to the bank until 20 or more signatures of financially responsible parties had been placed upon the note, and that it was delivered to the bank by Kerley in violation of the agreement, all to the bank's knowledge. It was held that if the bank took the note in good faith and for value it was protected as a holder in due course.

The facts in *Liberty Trust Co. v. Tilton*, supra, were similar to those in the *Kerley* case. A note, complete except that the amount was blank, was signed by the defendant on the back for the accommodation of the maker, who agreed not to deliver it until another signature was obtained, and further that the instrument would be filled in for $200 and no more. The other signature was not obtained, and the blank was filled in for $400. The bank took the note in good faith and without knowledge of the agreement, and was held to be protected as a holder in due course. A like result was reached in *Boston Steel & Iron Co. v. Steuer*, 183 Mass 140, 66 NE 646, 97 Am St Rep 426, where the case was this: The maker handed a check complete in every respect to her husband upon express instructions to deliver it to the payee on her own account, but the check fraudulently was handed by the husband to the payee in payment of a debt from him to the payee, and it was accepted in good faith by the payee.

In the later case of *National Investment & Security Co. v. Corey*, 222 Mass 453, 111 NE 357, it was held that where checks were made payable to the defendant

by a company with which the defendant had no business relations and which was not indebted to the defendant and were delivered to the defendant by a third party with instructions to credit the checks to his account, which was done, the defendant was protected as a holder in due course, the checks having come to the defendant without notice of any infirmity.

Numerous other cases illustrating the application of the rule are collected in Beutel's Brannan Negotiable Instruments Law (7th ed) 678–682.

A recent decision of peculiar interest because its facts so markedly resemble the facts of the instant case is *Columbia Federal Savings & Loan Ass'n v. Jackson*, (Mun Ct of App for Dist of Col), 131 A2d 404 (1957). We take the following from the court's statement of the facts:

"On October 19, 1954, the appellee, an illiterate who was unable to read but capable of signing his name, was approached by representatives of the Gibson Builders and PreFab Agency (hereinafter called Gibson) who persuaded him to sign a contract for the installation of an aluminum roof on his residence for the sum of $978. Four instruments previously obtained by Gibson from the Association consisting of a credit application addressed to the Association for a Federal Housing Authority guaranteed property-improvement loan, a promissory note naming the Association as payee in the sum of $1,124.50 payable in thirty-six monthly installments of $31.24, a borrower's authorization certificate, and an F.H.A. Title I completion certificate were submitted to appellee for his signature along with a contract for the work. The difference between the contract price and the face amount of the note represented finance charges of the Association."

The testimony of Jackson, the appellee, showed that it was represented to him that the note which he

signed was in fact the contract. The fraud was of the same character as that disclosed by the testimony in this case. Following the execution of the instruments Gibson submitted them to the Association. It approved the financing of the roof installation, advanced the contract price to Gibson, and accepted the note made payable to it as payee. The Association sued on the note. On the trial the court denied a requested instruction that the Association could be a holder in due course. On appeal this was held to be error, and a judgment for the defendant was reversed.

Plaintiff, while conceding that the rule in Oregon is as above stated, contends that it is not applicable to the facts of this case. He claims that the defendants had an affirmative duty to determine Smith's authority to dispose of the money that they paid Smith. For this he relies on decisions of this court which are distinguishable and of other courts which we think are not to be accepted as controlling or persuasive in Oregon.

We have a case in which a third party, a non-holder, transferred the paper to parties claiming to be holders in due course. The rule is thus stated in Britton on Bills and Notes, p 508:

"Where the payee is insulated from the maker or drawer by a third party, such as by an agent for the maker or drawer, or by a remitter, the payee, in fact, may be a purchaser for value before maturity and without knowledge of the maker's or drawer's defense."

Plaintiff's theory seems to be that advocated by Professor Underhill Moore in an article in 20 Col L Rev 749 and which is summarized in Britton, op cit 519. While conceding that a payee may be a holder in due course, the article adopts a middle ground and sug-

gests that under certain circumstances, notwithstanding the payee meets all the requisites of § 52 of the Uniform Negotiable Instruments Law, which is the same as ORS 71.052, he is not so to be regarded. One of these circumstances is said to be where the payee takes from a third party, who appears to be the agent of the drawer or maker. For present purposes that may be assumed to be the state of this case. The Moore doctrine, however, is not approved by Britton, who says, after referring to other learned treatises which discuss the question:

"To the present writer the views expressed by the last two writers above referred to seem preferable. If the payee is to be a holder in due course at all he should be such on the same terms as those who take from prior holders, i.e., on proof of taking in good faith, for value and before maturity. The particular set of facts which has made possible the perpetration of the fraud by the party who delivers the instrument to the payee upon the defendant obligor should be immaterial. Once it be granted that a payee may be a holder in due course under the Act, no limitations should be imposed other than those specified in Sec. 52, which concerns good faith taking for value before maturity. The proposition, apparently accepted by some of the courts which have adopted the minority view, that a payee cannot be a holder in due course even though he is a good faith taker for value before maturity, and at the same time to state (*obiter*) that in other situations he may be a holder in due course is difficult to sustain as a matter of statutory construction. Nor are such distinctions persuasive on the matter of policy." Britton, op cit 522.

The decisions of this court relied on by the plaintiff are *Fawkes v. Curtis*, 133 Or 20, 286 P 981, and *Bank of Gresham v. Walch*, 76 Or 272, 147 P 534. In the latter case the defendant executed a promissory

note to the plaintiff bank in payment of stock of another corporation. The execution of the note was procured by fraudulent means by the representatives of such other corporation, who delivered the note to the bank and received the consideration therefor. It was held that the bank could not recover from the defendant. The court said "The plaintiff bank was the original payee named in the note sued on. It has never been endorsed or transferred. Plaintiff is not a holder thereof in due course within the meaning of the statute." (76 OR 279) It was also said that "it was incumbent upon the bank to pay to defendant the consideration for the note which it received or to satisfy itself that he had been paid, and that the note was valid." Ibid.

This court's comment upon the *Walch* case in *American Nat. Bank v. Kerley,* supra, is sufficient to show that it is not controlling authority on the question now under consideration. In substance it is there stated (109 Or 190) that the court had already given notice in *Simpson v. First Nat. Bank,* 94 Or 147, 159, 185 P 913, that the *Walch* case should not be construed to mean that the payee is never a holder in due course and that the decision in that case was controlled by the fact that the false representations were made by agents of the bank. The clear implication of this court's discussion of the *Walch* case is that but for the fact that the evidence showed the bank's knowledge of the fraud the decision must have gone the other way.

*Fawkes v. Curtis,* supra, is no more to the point. A loan company accepted an order to pay a sum of money to a subcontractor for work done by him on a construction job. Subsequently the loan company issued a check payable to the subcontractor for the amount approved in the order and delivered the check

to the contractor, who in turn delivered it to the sub-contractor under an agreement that it should be applied for the most part in payment of the former's indebtedness to the latter. It was so applied, though the subcontractor knew of the terms of the order and understood that the check was issued by the loan company in payment for his labor and material on the contract job. It was under these circumstances, that is, of actual knowledge on the part of the payee of the check of the purpose for which it was given, that the court held that he must account for the rightful application of the proceeds of the check.

Among cases from other jurisdictions upon which the plaintiff relies is *Bowles Co. v. Clark*, 59 Wash 336, 109 P 812. While the case has certain distinguishing features, such as circumstances which should have put the payee on notice that the transferor of the check was unreliable, still it may be conceded that there is language in the opinion which tends to support the plaintiff's position. But it should be observed that the Washington court in *Kohler v. First Nat. Bank of Tonasket*, 157 Wash 417, 424, 289 P 47, said of this case that it was in line with cases which hold that the payee cannot be a holder in due course. See, also, the comment upon *Bowles Co. v. Clark* in the *Kerley* case, 109 Or 188.

We will comment briefly on the other decisions cited by the plaintiff. Of *Camp v. Sturdevant*, 16 Neb 693, 21 NW 449, it should suffice to say that it was decided before the adoption of the Uniform Law and that, as the writer of a law review article says, "Nebraska was the one state which prior to the adoption of the uniform law had clearly taken the position that a payee, because of his character as such, could not be a holder in due course." Lester W. Feezer, 9

Minn L Rev 101, 118. It is true that *Camp v. Sturdevant* was followed and cited with approval in the recent case of *American Surety Co. v. Smith, Landeryou & Co.*, 141 Neb 719, 4 NW2d 889. But, as Professor Feezer points out, Nebraska places severe limitations upon the "broader rule of such cases as *Liberty Trust Co. v. Tilton*," and it is that rule which, as we have seen, this court has adopted.

Three New York cases are cited: *Hathaway v. County of Delaware*, 185 NY 368, 78 NE 153; *Apostoloff v. Levy*, 170 NYS 930, aff. 174 NYS 828; *Empire Trust Co. v. President and Directors of Manhattan Co.*, 162 NYS 629, aff. without opinion 180 App Div 891. The first two do not cite the Negotiable Instruments Law, and they are inconsistent with the rule in this state, for they proceed upon the view that a check upon its face imports ownership of the moneys represented in it by the drawer, and therefore, it is said, that when the payee pays the money to a third-party transferor or applies it on an indebtedness of such third party, there results a diversion of the check. The *Empire Trust Co.* case was as follows: A drew a check on the defendant bank payable to the plaintiff and gave it to a messenger to have it certified and given to the plaintiff in payment for revenue stamps. The defendant certified the check, B stole it, and, posing as A's messenger, delivered it to the plaintiff, who gave full value for it. In an action by the plaintiff against the defendant it was held that, even assuming that the plaintiff acted in good faith, the plaintiff was not a holder in due course and could not recover. This decision is sharply criticized by Beutel's Brannan, op cit 686–687, where the author says that it is "contrary to the great weight of authority both at common law and under the Negotiable Instruments Law" and

that the court "reached its result by making a vain distinction between the case before it and the Massachusetts cases." We do not see how it is possible to reconcile the decision with the construction of § 30 of the Negotiable Instruments Law (ORS 71.030) as to what constitutes negotiation in *Liberty Trust Co. v. Tilton*, supra, 217 Mass 464–465, and approved by this court in the *Kerley* case. See comment, 30 Harv L Rev 515.

■ In *Brown v. Feldwert*, 46 Or 363, 367, 80 P 414, it was held that even though the fact that a promissory note was obtained by fraud, the maker being led into believing that he was signing a paper of an entirely different character, is a good defense against an innocent purchaser for value—a question which was left open—it is not so unless the note was obtained without the negligence of the maker, and that this is a matter to be pleaded and proved. See, also, *Foster v. University Lumber Co.*, 65 Or 46, 69, 131 P 736, and cases collected in 160 ALR 1328. Here the plaintiff, although a man of quite limited education, was able to read English, and, by his own testimony, knew the risk he ran in signing a blank printed form. Nevertheless he signed it. Clearly this was negligence. See the authorities discussed by the court in *Brown v. Feldwert*, supra. And it was negligence which enabled Napco's representatives to perpetrate a fraud on the defendants, so that the rule might well be applied that, whenever one of two innocent persons must suffer by the acts of a third party, he who has enabled the third party to occasion the loss must sustain it. *Wabash Valley Trust Co. v. Fisher*, 220 Ind 133, 41 NE2d 352, 142 ALR 486; *Drumm Const. Co. v. Forbes*, 305 Ill 303, 137 NE 225, 26 ALR 764.

The Negotiable Instruments Law contains these provisions:

ORS 71.055. "The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith or under such circumstances as amount to fraud."

ORS 71.056. "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

ORS 71.057. "A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

■ The plaintiff having shown that his signature to the note was obtained by fraud and that the title of Napco's agent was defective, the burden was cast upon the defendants of establishing that they acquired the title as holders in due course. *Bank of Jordan Valley v. Duncan*, 105 Or 105, 123–124, 209 P 149; *Brown v. Feldwert*, supra, 46 Or at 369. They were required to show that they took in good faith. As Mr. Justice Burnett, writing for the court in the *Bank of Jordan Valley* case, said:

"When a maker publishes his note to the world, negotiable in form, it is not incumbent upon anyone to whom it is offered, unless there be circumstances of suspicion, to busy himself inquiring about infirmities. He has a right to purchase the note, pro-

vided he acts in good faith, without searching for defects of which there is no indication on the face of the note, unless he has knowledge of such facts as would make his purchase a matter of bad faith."

See, also, *Bank of California v. Portland H. & W. Co.*, 131 Or 123, 138, 282 P 99; *Topco., Inc. v. 1st Natl Bank of Portland*, 202 Or 32, 39, 273 P2d 420.

The case comes within the rule that a payee may be a holder in due course. The defendants fully sustained their burden of proof, and the plaintiff is not entitled to the remedy of cancellation which he seeks.

The decree of the circuit court is reversed and the suit is dismissed. No costs or disbursements will be allowed.